**H. Clive FRANKLIN,**

v.

**SKF USA INC.**

No. CIV.A. 00–619.

United States District Court,
E.D. Pennsylvania.

Dec. 22, 2000.

Joseph R. Pozzuolo, Gary M. Perkiss, Pozzuolo & Perkiss, P.C., Philadelphia, PA, for Plaintiff.

Nathan D. Finch, Lloyd H. Mayer, Caplin & Drysdale, Washington, DC, for Defendant.

### MEMORANDUM

DALZELL, District Judge.

A former officer and director of a manufacturing corporation sues for post-retirement benefits allegedly owed him under the corporation's bylaws. The parties' dispute centers on the actual content of the bylaw in question and the legal relationship between the plaintiff and the defendant. We here consider the parties' cross-motions for summary judgment.

## I. *Factual Background* [1]

### A. *H. Clive Franklin's History With SKF USA and Related Entities*

H. Clive Franklin, the plaintiff in this case, is a subject of the United Kingdom who is now sixty-six years old, Joint Stip. of Facts ¶ 1. In 1979, Franklin began work with SKF UK Ltd., a subsidiary of the Swedish firm AB SKF, as Managing Director in the United Kingdom, Affidavit of H. Clive Franklin ¶ 3. AB SKF and its subsidiary firms are manufacturers primarily engaged in the making of bearings.

In 1985, Franklin came to the United States, where he assumed several positions with AB SKF subsidiaries. On October 18, 1985, he became president of SKF USA, the defendant in this case, a position in which he served until December 31, 1988, Joint Stip. of Facts ¶ 10. Also on October 18, 1985, Franklin became a director of SKF USA, a position in which he served until March 30, 1993, Joint Stip. of Facts ¶ 7, *see also* Ex. 14 to Def.'s Mot. for Summ. J. (minutes of SKF USA Board of Directors meeting of October 18, 1985). From October 1985 until 1991, partially coincident with his service as president of SKF USA, Franklin also served as president of SKF North America, a company

1. Although the parties differ sharply on the legal interpretation of the events discussed below, there are no disputes as to any issue of fact material to the issues. As will readily become apparent, our jurisdiction is founded upon diversity.

AB SKF created to manage and direct AB SKF's three corporate subsidiary operations in North America, SKF USA, SKF Canada, Inc., and SKF Mexico SA, Affidavit of H. Clive Franklin ¶¶ 4 & 5.

After concluding his term of service as president of SKF USA at the end of 1988, Franklin remained president of SKF North America, which at that time, and pursuant to a corporate realignment within the SKF family of companies, had assumed responsibility for managing all of AB SKF's global subsidiaries within the specialty bearings division, Affidavit of H. Clive Franklin ¶¶ 11 & 12.[2] During the whole time of Franklin's service in the United States, SKF North America paid him and he worked out of an office in Pennsylvania, Joint Stip. of Facts ¶ 8. On January 1, 1992, Franklin was reassigned to SKF Headquarters in Gothenberg, Sweden, as the Executive Director of SKF Speciality Division, Ex. H, Pl.'s Mot. for Summ. J. (contract of employment for period January 1992 through February 1994).

On March 30, 1993, Franklin retired as a director of SKF USA, at which time he was 59 years of age, Joint Stip. of Facts ¶ 7, Ex. 18, Def.'s Mot. for Summ. J. (minutes of March 30, 1993 SKF USA shareholder's meeting).

### B. *SKF USA, Its Bylaws, and Directors' Compensation*

SKF USA is a Delaware corporation authorized to do business in Pennsylvania, with a principal place of business in Norristown, Pennsylvania, Joint Stip. of Facts ¶ 2, and has been located and operated in Pennsylvania since 1933, Joint Stip. of Facts ¶ 5.[3] SKF USA is a subsidiary of AB SKF, which owned, as of 1993, more than 95% of SKF USA's outstanding stock, Ex. 19, Def.'s Mot. for Summ. J.

In February 1976, at the recommendation of F. James Skinner (then the president and a director of SKF USA), SKF USA's board of directors unanimously resolved to amend Article III, section (5) of the corporation's bylaws, entitled "Compensation", to permit the Board of Directors to pay an annual retainer fee to certain directors. The amended text of Article III, section (5) read:

> An annual retainer fee may be paid directors, as such, for their services, as determined by resolution of the Board of Directors. In addition, a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of such Board, as determined by resolution of the Board of Directors.

Ex. 12, Def.'s Mot. for Summ. J. at SKF00164 (minutes of SKF USA board meeting of Feb. 10, 1976).

In February 1984, the Board of Directors again unanimously voted to amend bylaw Article III, section (5) in order to provide for post-retirement compensation for certain directors. The new amended version read:

> *Compensation.* An annual retainer fee may be paid directors, as determined by resolution of the Board of Directors. In consideration of his past service as a director and his continued availability as a consultant to render advice to the Board, a director, upon his retirement from the Board at age 70, shall be eligible to receive the annual retainer paid him at the time of his retirement, for

---

**2.** That is, where previously SKF North America had been geographically responsible for the operations of SKF subsidiaries in North America, after the realignment at the end of 1988 it was no longer responsible for North American continental operations but rather was functionally responsible for all of SKF's specialty bearing operations worldwide.

**3.** Until 1985, SKF USA was named SKF Industries, Inc., Joint Stip. of Facts ¶ 3. For the purposes of this Memorandum, we will refer to this corporate entity only as "SKF USA" without regard to whether it was at the pertinent time operating as SKF Industries, Inc.

life, provided he shall have had at least five years of continuous service as a director. If a director shall retire from the Board prior to age 70, he shall be eligible to receive one-half of the annual retainer paid him at the time of his retirement, for life, provided he shall have had at least five years of continuous service as a director. Unless otherwise specified by resolution of the Board of Directors, post retirement compensation to directors as herein provided shall be paid quarterly.

Ex. 13, Def.'s Mot. for Summ. J. at SKF00181 (minutes of SKF USA Board meeting of Feb. 13, 1984). Bylaw Article III, section (5) was again amended in 1986 to add additional language preventing a retired director from assigning his interest in his post-retirement income, but this amendment did not affect the operative language quoted above, Ex. 15, Def.'s Mot. for Summ. J. (minutes of SKF USA Board meeting of December 11, 1986).[4] Consequently, the parties agree that it is the portion of Article III(5) quoted above that governs the dispute between the parties here over Franklin's director compensation.

After Franklin was reassigned to Europe as director of SKF Speciality Division on January 1, 1992, SKF USA paid him compensation for his continuing membership on SKF USA's Board of Directors. SKF USA paid Franklin a "board fee" of $12,500 for 1992, as well as $4,500 for

attendance at four board meetings (at a rate of $1,125 per meeting), Ex. 21, Def.'s Mot. for Summ. J. at SKF00517[5] (spreadsheet showing payments made to SKF USA board members in 1992), Ex. 39, Def.'s Mot. for Summ. J. (letter of Dec. 12, 1991 from Olle Ranang, Group Personnel Director, to Allen G. Belenson of SKF USA) (stating that Franklin should receive a "Board fee from SKF USA from 1992. The same level as the other SKF members."), Ex. 40, Def.'s Mot. for Summ. J. (letter of Feb. 26, 1992 from Olle Ranang, Group Personnel Director, to H. Clive Franklin) (stating "As a Board member of SKF USA, Inc you have a fee of 12 500 USD from 1992–01–01. The amount will be paid in December."). Franklin also received a "board member fee" of $3,125 for the first quarter of 1993, in addition to a payment of $1,125 for attending one board meeting, Ex. 41, Def.'s Mot. for Summ. J. (letter of May 13, 1993 from Ulf-Goran Ericsson of SKF Group Headquarters to John Lonati of SKF USA) (stating that "Tommy H Karlsson and H Clive Franklin are both entitled to a board member fee for the first quarter of 1993, i e USD 3 125.—plus USD 1 125.—for attendance to [*sic*] one board meeting (USD 4 250.—each.)")

It is undisputed that SKF USA has refused to pay Franklin any post-retirement compensation since his departure from the Board of Directors in 1993, Joint Stip. of Facts ¶ 14.

---

**4.** Article III, section (5) was once again amended at a meeting of the Board in May 1993, shortly after Franklin's retirement as director. This amendment explicitly stated that post-retirement compensation would be available for only two classes of directors: (1) directors who retired from the board prior to March 30, 1993 and who were receiving post-retirement compensation pursuant to Article III(5) at the time of retirement; and (2) outside directors. (defined as directors "not ever employed by" SKF USA) who were elected to serve as a director at the March 30, 1993 shareholder meeting and who are otherwise eligible to receive post-retirement compensation pursuant to Article III(5), Ex. 20, Def.'s

Mot. for Summ. J. (minutes of SKF USA board meeting of May 6, 1993). The effect of this amendment would appear to be to end the practice of providing post-retirement director's compensation. However, SKF USA has explicitly eschewed reliance on this amendment of Article III(5) as a defense to Franklin's instant claim for compensation, Def.'s Mem. of Law at 12 n.5, and we therefore need not further consider its effect.

**5.** The defendant has helpfully Bates-numbered each page of its exhibits, and we refer to these numbers when making pinpoint citations to these materials.

## II. *Analysis* [6]

As an introduction to our analysis here, and to clarify the manner in which we will proceed, we first outline the parties' basic arguments.

Franklin's argument is straightforward. He claims that Pennsylvania law applies to this action and that under Pennsylvania law we must interpret corporate bylaws, absent ambiguity, by their plain language.[7] Here, Franklin argues, the plain language of Article III(5) mandates that a director who retires from the board prior to the age of 70, as Franklin did, and who had more than five years of continuous service as a director, as Franklin had, is then eligible to receive for life an annual payment of one-half the annual retainer he was receiving at the time of his retirement. Thus, claims Franklin, since he meets the conditions established by Article III(5), he should receive the payments provided for in that bylaw.

For its part, SKF USA first argues that Delaware law controls our interpretation of SKF USA's bylaws, since SKF USA is a Delaware corporation. It then contends that Delaware law permits a corporation effectively to amend its bylaws by a course of conduct,[8] and that in fact SKF USA amended Article III(5) through a course of conduct in which SKF USA paid directors' retainer fees and post-retirement compensation only to "outside" directors, but not to "inside" directors.[9] Franklin, SKF USA maintains, was an "inside" director until 1992 and for that reason, and because he did not have five years consecutive service as an outside director, was not eligible to receive post-retirement compensation.

In order to evaluate these contrary positions, we address in turn a number of issues. First, we examine the choice of law applicable to the issues here. Second, we examine Franklin's relationship with SKF USA. Third, we use applicable law to interpret the meaning of Article III(5). Finally, we apply Franklin's status to our interpretation of Article III(5) to determine whether he is eligible for post-retirement payments.

### A.  *Choice of Law*

■ As a federal court sitting in the Commonwealth of Pennsylvania, we employ Pennsylvania's choice of law rules. "In cases where the substantive laws of Pennsylvania conflict with those of a sister

---

**6.**  A summary judgment motion should only be granted if we conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c). In a motion for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact is in dispute, *see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and all evidence must be viewed in the light most favorable to the nonmoving party, *see id.* at 587, 106 S.Ct. 1348. Once the moving party has carried its initial burden, then the nonmoving party "must come forward with 'specific facts showing there is a genuine issue for trial,'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)) (emphasis omitted); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, we must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995).

**7.**  In the alternative, he argues that Delaware law mandates the same interpretation.

**8.**  In the alternative, it argues that Pennsylvania law mandates the same interpretation.

**9.**  We will further discuss the meaning ascribed to these terms below.

state in the civil context [10], Pennsylvania courts are to take a flexible approach which permits analysis of the policies and interests underlying the particular issue before the court," *Larrison v. Larrison,* 750 A.2d 895, 898 (Pa.Super.2000) (citing *Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796, 805 (1964)). The Pennsylvania approach combines the methodologies of the "government interests analysis" and the "significant relationship" approach, and requires both that we assess the contacts between the various states and the cause of action "qualitatively rather than quantitatively" and that we analyze the extent to which one state rather than another has demonstrated through its policies a priority in interest in the application of its law, *Normann v. Johns–Manville Corp.,* 406 Pa.Super. 103, 593 A.2d 890, 893 (1991).

Leaving these principles aside for the moment, we pause to consider SKF USA's argument that 15 Pa. Con. Stat. Ann. § 4145(a) requires us to apply the law of SKF USA's state of incorporation—Delaware—to the issue of the interpretation of SKF USA's bylaws, bypassing the standard choice of law analysis. 15 Pa. Con. Stat. Ann. § 4145, entitled "Applicability of certain safeguards to foreign domiciliary corporations," states in relevant part:

(a) General Rule. The General Assembly hereby finds and determines that foreign domiciliary corporations sub-

stantially affect this Commonwealth. The Courts of this Commonwealth shall not dismiss or stay any action or proceeding brought by a shareholder or representative of a foreign domiciliary corporation, as such, against the corporation or any one or more of the shareholders or representatives thereof, as such, on the ground that the corporation is a foreign corporation for profit or that the cause of action relates to the internal affairs thereof, but every such action shall proceed with like effect as if the corporation were a domestic corporation. Except as provided in subsection (b), the court having jurisdiction of the action or proceeding shall apply the law of the jurisdiction under which the foreign domiciliary corporation was incorporated.

(b) (Reserved)

Upon consideration, we find that this statutory provision does not compel our decision here. By its plain language, this statute refers to a particular set of cases, namely those "brought by a shareholder or representative of a foreign domiciliary corporation, as such, against the corporation or any one or more of the shareholders or representatives thereof, as such." There is no suggestion here that Franklin brought his suit in his capacity as a shareholder or representative of the corporation, and therefore 15 Pa. Con. Stat. Ann. § 4145 is, by its plain language, not directly applicable to this case.[11]

10. We note with respect to this that both parties make passing claims, arguing in the alternative, that even if we accept the choice of law urged by their opponent, the law of that state also supports their desired interpretation of the bylaws. Notwithstanding these contentions, we find that given the subtleties of interpretation required, there is a genuine conflict between the laws of Pennsylvania and Delaware with respect to the issues at play here, and we will therefore proceed with our choice of law analysis.

11. We note that we have only been able to locate one Pennsylvania case applying 15 Pa. Con. Stat. Ann. § 4145, *In re Estate of Hall,* 731 A.2d 617 (1999), which is the main case to which SKF USA cites in presenting its

argument under § 4145. However, *In re Estate of Hall* was a suit against a corporation by a shareholder of that corporation regarding the price that the corporation's bylaws required the corporation to pay to buy back the shareholder's shares. Since *In re Estate of Hall* was therefore a suit by a shareholder, as such, against the corporation, it fell neatly within § 4145's ambit, where this case does not. To the extent that 15 Pa. Con. Stat. Ann. § 1103 includes a director of a corporation within the definition of "representative" for statutory purposes, we observe that Franklin is suing SKF USA at most in his capacity as a *former* director, a position clearly not included within the definition of "representative" for purposes of § 4145.

We must therefore look to general Pennsylvania choice of law rules to determine which state's law applies here. This requires that we examine the contacts between the relevant states and the action, and also consider the interests each state has in the action. Pennsylvania's contacts with this action include that SKF USA's principal place of business, as well as other corporate facilities, are located in Pennsylvania and that Franklin's entire employment with SKF USA was conducted in Pennsylvania.[12] Delaware's contact with this action is that SKF USA was incorporated in that state.[13]

■ Given these contacts, we conclude that we should apply the law of Delaware to the dispute here. We begin by noting that contacts are evaluated qualitatively, and not quantitatively; therefore, the fact that Pennsylvania has more contacts with this dispute than does Delaware is not directly relevant to the analysis under Pennsylvania choice of law rules.

On the other hand, Delaware's contact as the state of incorporation, given the nature of the dispute before us, is of transcendent qualitative significance. The parties here differ on the proper interpretation of a Delaware corporation's bylaw, and the compensation that the corporation owes its directors.[14] These questions are clearly associated with the firm's internal governance and are therefore quintessentially ones associated with the state in which the corporation chose to incorporate itself. Therefore, Delaware's contact with this dispute has greater weight in our choice of law analysis than the fact that SKF USA's principal place of business is in Pennsylvania or that Franklin worked there.

With respect to the interest each state holds in the issues before us, we note first that Delaware has a clear interest in regulating the internal affairs of those entities incorporated under its laws. Pennsylvania, on the other hand, has a more attenuated interest. While we found above that 15 Pa. Con. Stat. Ann. § 4145 does not directly apply to our circumstances, that provision also shows that the Pennsylvania General Assembly recognizes that certain matters, internal to a corporation, are properly adjudicated under the laws of the state of incorporation, rather than under

**12.** To the extent that Franklin's employment is an issue here, we would want to examine the contacts created by his contracts of employment. Pursuant to section 188 of the *Restatement (Second) of Conflict of Laws,* we would examine such factors as the place of contracting; the place of the contract's negotiation; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and place of business of the parties. As noted in the text, the "place of performance" and "location of the subject matter" were Pennsylvania, and SKF USA is a domiciliary of Pennsylvania. As will be discussed below, SKF USA is also domiciled in Delaware, by virtue of its incorporation there. Although SKF USA has provided as exhibits copies of Franklin's various employment contracts, Exs. 31–36, Def.'s Mot. for Summ. J., the parties do not discuss the place of the contracting or the contracts' negotiation; in our circumstances this is not readily apparent given the international nature of the parties to the contract (for example, AB SKF was a signatory to each of the contracts). For our purposes, the absence of this information is not significant. Moreover, and as we note below, to the extent there is a "contract" at issue here, it is not any of Franklin's contracts of employment but rather the corporate bylaws themselves.

**13.** There is no dispute that Delaware has no other connections to this case outside of its being the state of incorporation; there is no claim, for example, that Franklin worked in Delaware or that SKF USA has any operations in Delaware.

**14.** Although this action would appear to be in the nature of a claim of breach of contract, it is interesting to note that Franklin's Complaint did not specify the nature of the action. Rather, the Complaint set forth a series of paragraphs under the heading "Allegations of Fact" and followed them immediately by an *ad damnum* clause. In any event, even to the extent that we view this as a contract matter, the "contract" is exactly the bylaw provision regarding director's compensation, and thus our resolution of the claims here inevitably involves construing that bylaw.

Pennsylvania law, even though the case is ongoing in a Pennsylvania court. Moreover, the plaintiff in this case, though associated with Pennsylvania by virtue of his work here, was an integral part of the very internal corporate governance structure at issue here. This is therefore not a case where SKF USA is sued by a "stranger" who is a Pennsylvania citizen, in which case Pennsylvania's interest in protecting its citizen through the application of its laws would be much stronger.

On the basis of Delaware's stronger interest in this case, and its qualitatively greater contacts with it, we find that Delaware law should apply to the parties' dispute over the meaning of SKF USA's by-law Article III(5) and its application to Franklin as a former director of the firm. We note that this outcome accords with what section 302(2) of the *Restatement (Second) of Conflict of Laws* suggests, to wit, that in general that state of incorporation will have the most significant relationship to issues associated with the powers and liabilities of a corporation.

B.   *Franklin's Relationship with SKF USA*

As discussed at the outset, Franklin was a director of SKF USA from October 18, 1985 until March 30, 1993. He was president of SKF USA from October 18, 1985 until December 31, 1988, and thereafter reverted to his continuing role as president

of SKF North America. On January 1, 1992, Franklin, though still a SKF USA director, was assigned away from SKF North America and to another SKF entity in Europe. He retired from SKF USA's Board of Directors on March 30, 1993.

SKF USA, as we will explore below, claims that it has by a course of conduct amended Article III(5) of its bylaws so as to limit the payment of directors' retainers and post-retirement compensation to certain classes of directors, and in particular that these payments have been made only to "outside" but not to "inside" directors. We therefore must as a preliminary matter discuss how Franklin's association with SKF USA affected his status as an "outside" or "inside" director.

The first step is to assign a meaning for these terms. Of course, since it is SKF USA that is using them[15], we look for definitions it has assigned. In its brief, SKF USA does not pin itself down to precise definitions for the terms "outside" and "inside" directors. Instead, it refers to the declarations made by various current and former SKF USA officers and directors regarding their own, and the corporation's, understanding of the meaning of these terms. Unfortunately, the understandings expressed by the different officers and directors, while similar, are not identical,[16] and so they do not provide us with a "definitive" definition we can use.

---

15.   By claiming to have amended its bylaws in such a manner as to bring them into play.

16.   F. James Skinner, former president and director, who was involved in the 1976 amendment to Article III(5), stated that it was his, and SKF USA's, understanding that an "inside" director was "any director who was employed by or an officer of [SKF USA] or who received compensation for performing services for [SKF USA] in his role as an officer or company insider," Ex. 2, Def.'s Mot. for Summ. J. ¶ 3. Conversely, Skinner stated that it was his view that an "outside" director was "a director who was not an employee or officer of [SKF USA] and who had no other formal relationship with [SKF USA] other than providing services as a director," Ex. 2, Def.'s Mot. for Summ. J. ¶ 3. The definitions

given by Allen G. Belenson, SKF USA's General Counsel and Corporate Secretary from 1974 to 1999, were largely the same as Skinner's, Ex. 3, Def.'s Mot. for Summ. J. ¶ 6.

On the other hand, Mauritz Sahlin, a member of SKF USA's Board from 1985 through 1995, stated that an inside director was simply "a director who is an officer or employee of SKF USA," Ex. 4, Def.'s Mot. for Summ. J. ¶ 4. In his declaration, Sahlin notes that he himself was an "outside" director by virtue of the fact that he was employed, during his tenure as director, by "AB SKF, the parent company," and that he never received compensation for performing services for SKF USA in any role other than that of director, Ex. 4, Def.'s Mot. for Summ. J. ¶ 2.

On the other hand, all the officers' and directors' stated understandings, in addition to being similar to one another, are also similar to those found in outside legal sources. Under Delaware law, an "outside" director is a "non-employee and non-management director," *Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1375 (1995), and *Black's Law Dictionary* defines "inside director" as a "[d]irector who is an employee, officer or major stockholder of [a] corporation" and an "outside director" as a "[n]on-employee director with no, or only minimal, direct interest in [the] corporation," *Black's Law Dictionary* at 460 (6th ed.1990). For the purposes of defining Franklin's role with SKF USA, then, we will define an "inside" director as a director who is an employee or officer of that corporation, and an "outside" director as a director who is not an employee or officer of that corporation.[17]

We observe that there appears to be no dispute between the parties that after January 1, 1992, Franklin was an outside director of SKF USA, having as of that date commenced his employment with a European branch of SKF and having ended his relationship with SKF North America.[18] That SKF USA itself considered him to be an outside director at that point is conclusively evidenced by the fact that SKF USA then began to pay him director's fees, an action that, by its own theory of the case, it would not have taken unless Franklin were an outside director.

From October 18, 1985 through December 31, 1988, Franklin was an inside director of SKF USA. In reaching this conclusion, we must address Franklin's argument that he was never an inside director of SKF USA. This argument has three separate foundations. First, Franklin notes that it is undisputed that during his entire period of work in the United States he was paid by SKF North America and not by SKF USA; as a result, he argues, he could never have been an inside director of SKF USA. Second, Franklin argues that his 1991 foreign service contract, Ex. G, Pl.'s Mot. for Summ. J., stated that Franklin was always employed by SKF UK, and also included diction stating that it controlled all prior contracts; therefore, he claims, the provisions of this 1991 contract establish that he never worked for SKF USA and was thus never an inside director. Third, Franklin contends that he and representatives of SKF USA and SKF UK signed a letter dated April 15, 1991, Ex. E, Pl.'s Mot. for Summ. J., attesting to the fact that Franklin had, since his arrival in the United States, remained an employee of SKF UK; Franklin argues that this also establishes that he was never an employee of SKF USA and hence never was inside director.

None of these claimed foundations, however, in fact supports the claim that Franklin was never an insider director. Most fundamentally, none of these materials can erase the undisputed—indeed, stipulated—fact that Franklin was *president*

---

Charles E. Long, who was Chairman and a member of the Board from 1985 through 1999, stated that an "inside" director is "a director who is an officer or employee of SKF USA, and/or a director who represents the interests of the company and management on the board, and not the interests of shareholders, whose interests are represented by the outside directors," Ex. 5, Def.'s Mot. for Summ. J. ¶ 4.

17. Similarly, because these definitions are fair representations of those given by SKF USA's officers and directors, we will examine SKF USA's claimed patterns of behavior with respect to "outside" and "inside" directors

using these definitions. We do note that SKF USA has on some occasions used a different definition of "outside" director, since the 1993 amendment to Article III(5)—which is not before us here—defined an outside director as a director who had *never* been employed by SKF USA.

18. As we will discuss below, Franklin contends that he was at all times an outside director, and never an inside director, of SKF USA, so the January 1, 1992 date is not significant to his argument, but as discussed it is clear that SKF USA concedes that he was an outside director from that date forward.

of SKF USA between October 18, 1985 and December 31, 1988. Although, as noted above, different sources define "inside director" slightly differently, if that term has any content whatsoever it must include a director who is also serving as president of the same corporation. The fact that Franklin's paycheck came from another entity does not cancel out the responsibilities of the office he held and the resulting implication that he was an inside director while he was president. Similarly, the fact that the parties signed a letter in 1991 stating that Franklin had remained an employee of SKF UK did not serve to rewrite history such that Franklin was never president of SKF USA, nor did any language in his 1991 employment contract have that effect. Thus, Franklin was an inside director from at least October 18, 1985 through December 31, 1988.

In considering Franklin's argument here, we note other weaknesses in his claims regarding the 1991 employment contract and the 1991 letter agreement. While the 1991 employment contract does state, "This contract renders ineffective all previous Foreign Service contracts between the FS–Employee and any SKF Company," Ex. G, Pl.'s Mot. for Summ. J. at SKF01574, this is simply boilerplate language that is included in others of Franklin's contracts, see Ex. 33, Def.'s Mot. for Summ. J. at SKF01582 (1989 foreign service contract), Ex. 34, Def.'s Mot. for Summ. J. at SKF01585 (1988 foreign service contract), Ex. 35, Def.'s Mot. for Summ. J. at SKF01587 (1987 foreign service contract), Ex. 36, Def.'s Mot. for Summ. J. at SKF01590 (1985 foreign service contract). Franklin has cited to us no case law to claim that this language in a later-signed contract serves to alter the terms of previous contracts;

rather, it would seem to us that a plain reading of the "renders ineffective" clause is that to the extent that any prior Foreign Service contract was by its terms still in effect between the parties on the date on which the new contract was signed, such a previous contract was rendered ineffective by the terms of the new one. This language, then, can in no way carry the load that Franklin wishes to put upon it.[19]

The 1991 letter likewise cannot be construed as eliminating Franklin's status as an inside director. With respect to this letter SKF USA argues that it resulted from Franklin's concerns, which he related to SKF USA, AB SKF, and SKF UK, regarding possible negative British tax treatment of his pension if he were not considered an employee of a British company. As a result of these concerns, SKF USA agreed to sign the letter stating that Franklin would be deemed an employee of SKF UK while on assignment in the United States, Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 22. SKF USA argues, and we agree, that this letter does not in any way foreclose the possibility that Franklin was simultaneously employed by SKF USA or SKF North America. We therefore cannot conclude from this letter that Franklin was never one of SKF USA's inside directors.

In any event, we have concluded above that on the undisputed facts, Franklin was an inside director of SKF between October 18, 1985 and December 31, 1988,[20] and that he was an outside director of SKF USA from January 1, 1992 until his retirement on March 30, 1993. This leaves Franklin's status for the period between January 1, 1989 and December 31, 1991 to be determined. However, to the extent that there

19. More than this, while Franklin claims that the 1991 contract states that he *always* was an employee of SKF UK—and in fact states that this is the "plain meaning" of the 1991 contract, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5 n.8—we cannot find any language in the agreement that so states, particularly not any that so states "plainly".

20. Again, this conclusion arises from the stipulated fact that Franklin was SKF USA's president for that period of time; while there may be disputes between the parties as to his exact employer during that time, this dispute is not material to our decision here.

is any dispute between the parties on any fact regarding Franklin's status for this period, we find that it is not material to our resolution of this case, and we will not further analyze it.[21] Instead, we will move forward to examine whether SKF USA in fact amended bylaw Article III(5) through a course of conduct.

### C. Interpretation of Article III(5)

#### 1. Could SKF USA Amend Article III(5) By a Course of Conduct?

■■■■ Generally, Delaware law holds that corporate charters and bylaws are interpreted using the same principles used to interpret statutes and contracts, and, therefore, when a court finds that a by-law's language is unambiguous, it "do[es] not proceed to interpret it or to search for the parties' intent behind the bylaw," *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (1983). Notwithstanding this general rule, however, "our courts have long held that bylaws may be amended or established by custom or by acquiescence in a course of conduct by those authorized to enact them," *In the Matter of the Osteopathic Hosp. Ass'n*, 195 A.2d 759, 762 (1963); *see also In re Ivey & Ellington, Inc.*, 42 A.2d 508, 509 (1945) ("Ordinarily, a corporate by-law may be amended by implication and without any formal action

being taken by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein....").[22] "[U]sually the course of conduct relied on to effect the change must have continued for such a period of time as will justify the inference that the stockholders had knowledge thereof and impliedly consented thereto," *Ivey & Ellington*, 42 A.2d at 509. "Clearly, however, one who contends that a written by-law has been amended by custom inconsistent therewith has the burden of establishing the existence of such a custom," *Belle Isle Corp. v. MacBean*, 49 A.2d 5, 8 (1946).

We therefore find that under the law governing this case, SKF USA may have amended Article III(5) through a course of conduct that established that director compensation and post-retirement compensation was provided only to certain directors. On the other hand, it appears equally clear that if there was no such amendment, then the clear language of Article III(5) provides that any director retiring before the age of 70 with five continuous years of service as a director—a class into which Franklin indisputably falls—should receive post-retirement compensation in the annual amount of one-half the annual retainer he received before retirement.[23] We must

21. Indeed, to a certain extent, this entire discussion regarding Franklin's status as an "inside" or "outside" director is not relevant to our resolution of this case, as will be seen below. Nonetheless, given the differences between the parties on this issue, we consider it, if only for the sake of completeness.

22. Franklin cites the "plain language" rule from *Hibbert* quoted above in the text and argues that this focus on the plain language of the statute forecloses any reliance upon an amendment by a course of conduct, as discussed in *Osteopathic Hosp. Ass'n* and *Ivey & Ellington*. We do not agree that these two principles are irreconcilable. *Hibbert* stands for the proposition that given an unambiguous document, the court will not consider parol evidence concerning its meaning or the intent of its drafters. On the other hand, the concept of amendment is quite distinct from that of interpretation. *Osteopathic Hosp.*

*Ass'n* and the other cases cited establish the perimeter of a method by which a corporation may informally amend its bylaws, not an alternate means of interpreting the language of a provision. That is to say, in our scenario, that until such time as SKF USA did amend Article III(5) by a course of conduct—if it in fact has done so—the language of the original, unamended version (that is, the language first adopted in 1984) is interpreted using the "plain language" rule pursuant to *Hibbert*. At the point where the course of conduct has created an amendment, however, the text is no longer controlling not because we no longer give voice to its plain meaning, but because the written text no longer represents the corporation's bylaw at all.

23. That is, we conclude that absent any amendment by a course of conduct, the language of Article III(5) as adopted regarding retirement pay to directors is indeed clear

now turn to the questions of whether SKF USA engaged in a course of conduct, whether, if so, it served to amend Article III(5), and what, if so, the content of that amendment was.

### 2. The Existence of a "Course of Conduct" Amendment to Article III(5) of SKF USA's Bylaws

#### a. The Course of Conduct

The first issue we must tackle in determining whether Article III(5) was amended by SKF USA's course of conduct is the nature and extent of the conduct at issue. As noted above, SKF USA, as the proponent of the "course of conduct" amendment, bears the burden of establishing the custom, and so we will start by examining its claims regarding the custom.

SKF USA claims that it amended Article III(5) by a custom or usage whereby the payment of directors' benefits was limited only to certain directors. In particular, SKF USA claims that it paid benefits only to outside directors, and not to inside directors.[24] In seeking to demonstrate this, SKF USA details the history of its payments to directors.

SKF USA begins by arguing that it never paid the annual directors' retainer fee to any director who was an employee or officer of SKF USA, and points to SKF USA's conduct with respect to the following individuals as evidence of this practice:

- F. James Skinner, who was both president and a director from 1973 until 1985 was never paid an annual retainer as director, Ex. 2, Def.'s Mot. for Summ. J. ¶ 6;

- Jan Essunger, president in 1989 and director in 1989 and 1990, was not paid an annual retainer as director, Ex. 6, Def.'s Mot. for Summ. J. ¶ 7 (Declaration of Brian J. Duffy, current Treasurer, former Supervisor/Manager of Cash Management, and former Corporate Risk Manager of SKF USA);

- Bo Overgaard, president in 1990 and director in 1990 and part of 1991, was not paid an annual retainer during the time he was a director, Ex. 6, Def.'s Mot. for Summ. J. ¶ 8;

- Raymond B. Langton, president and director from 1992 through 1995, was not paid an annual retainer during the time he was a director, Ex. 6, Def.'s Mot. for Summ. J. ¶ 9;

- H. Clive Franklin, president from 1985 through 1988 and director from 1985 to 1993, was not paid a retainer for his service as a director for the period

and unambiguous, and would, if given effect (that is, if it was not amended), require SKF USA to pay post-retirement compensation to Franklin. This result arises in the first instance from the simplicity of Article III(5)'s language itself. As quoted in the text above, the provision states baldly that "If a director shall retire from the Board prior to age 70, he shall be eligible to receive one-half of the annual retainer paid him at the time of his retirement, for life, provided he shall have had at least five years of continuous service as a director." We cannot see how this language is at all ambiguous regarding the class of directors eligible to be paid.

With respect to this, we note that SKF USA has attached as exhibits to its motion declarations from a number of SKF USA's current and former officers and board members. One of the topics of these declarations, to which SKF USA refers in its arguments, is the directors' intent in amending Article III(5); in particular, these declarations maintain that it was the directors' intent to provide compensation, both pre- and post-retirement, only to outside directors, Ex. 2, Def.'s Mot. for Summ. J. ¶¶ 4, 5, 7, 8 (Decl. of F. James Skinner, president and director of SKF USA 1973–1985); and Ex. 3, Def.'s Mot. for Summ. J. ¶¶ 7,8, 10 (Decl. of Allen G. Belenson, General Counsel and Corporate Secretary of SKF USA 1974–1999). As Hibbert makes clear, though, given the unambiguous nature of the language of Article III(5), we have no reason to examine these professions of the Board's intent in determining the meaning of that language, and instead must let the plain language guide us.

Consequently, the critical question here is whether Article III(5) was in fact amended by a course of conduct.

24. We have addressed the definitions of these terms above.

1985–1991, although he was paid for 1992 and the first quarter of 1993, Ex. 6, Def.'s Mot. for Summ. J. ¶ 10.

In further support of its position, SKF USA notes that in its declarations, various former officers and directors stated that, to their knowledge, no inside director had ever received a retainer, Ex. 2, Def.'s Mot. for Summ. J. ¶ 6 (F. James Skinner); Ex. 3, Def.'s Mot. for Summ. J. ¶ 9 (Allen G. Belenson); Ex. 4, Def.'s Mot. for Summ. J. ¶ 3 (Mauritz Sahlin), Ex. 5 Def.'s Mot. for Summ. J. ¶ 3 (Charles E. Long). Based upon the definitions that these declarants had ascribed to the terms inside and outside director[25], we can at least say that these statements mean that no director who was then an officer or employee of SKF USA had ever, to the declarants' knowledge, received the annual director's retainer fee.

SKF USA next argues that it engaged in a course of conduct whereby it has never paid post-retirement compensation to any retired inside director. In support, it points to the example of F. James Skinner, Ex. 2, Def.'s Mot. for Summ. J. ¶ 9. SKF USA also argues that each of the six retired directors who has ever received post-retirement compensation had never been employed by SKF USA and had each served for more than five years as an outside director, Ex. 6, Def.'s Mot. for Summ. J. ¶¶ 4, 5. Finally, SKF USA notes that in their declarations, various former officers and directors stated that, to their knowledge, SKF USA had never paid post-retirement compensation to any former director who was ever an inside director, Ex. 3, Def.'s Mot. for Summ. J. ¶ 12 (Allen G. Belenson), Ex. 4, Def.'s Mot. for Summ. J. ¶ 5 (Mauritz Sahlin), Ex. 5, Def.'s Mot. for Summ. J. ¶ 5 (Charles E. Long), Ex. 6, Def.'s Mot. for Summ. J. ¶ 5 (Brian J. Duffy).

Franklin does not dispute the factual existence of this conduct as such.[26] On the other hand, he does dispute that this conduct served to amend Article III(5) in the manner that SKF USA claims it did,[27] which takes us to the next step of our analysis.

b. *The Effect of SKF USA's Course of Conduct in Amending Article III(5)*

We now move to consider the what effect, if any, SKF USA's undisputed pattern of conduct, as detailed above, had in amending Article III(5). Before beginning our discussion, we note as an initial matter that Article III(5) has two distinct parts relevant to our case: first, Article III(5) provides for the payment of an "annual retainer fee" to directors, and second, Article III(5) provides for post-retirement

---

**25.** See our discussion above.

**26.** While not specifically challenging the strict veracity of these facts, Franklin does object to the manner in which they are presented to us. He argues that self-serving declarations are "the least reliable form of evidence," and that they cannot support the entry of summary judgment, primarily because there was no opportunity for cross-examination. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 4. We note, however, that both parties have elected to present witness statements in the form of declarations or affidavits only; there are no deposition transcripts of anyone before us here. This practice extended to the plaintiff himself, who submitted two of his own affidavits for our consideration, Ex. C, Pl.'s Mot. for Summ. J., Ex. A, Pl.'s Resp. to Def.'s Mot. for Summ. J. To the extent that both parties, in filing their cross-motions for summary judg-

ment, each expected, and indeed relied upon the fact, that we would enter judgment based upon a record that did not include cross-examination testimony, we cannot see how Franklin's objection here should bar us from considering the record and relying upon it, *see also* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane *Federal Practice and Procedure* § 2738 (3d ed.1998) (detailing the use of affidavits in support of or in opposition to a motion for summary judgment). In any event, our findings here do not rely solely on these declarations.

**27.** Franklin does argue that SKF USA's presentation of the "conduct" information is somewhat incomplete, see Ex. C, Pl.'s Resp. to Def.'s Mot. for Summ. J., but these arguments also go to the legal import of the actions or inactions rather than to their existence.

compensation for directors who meet certain criteria.

It is also helpful at this point to state SKF USA's position with respect to Article III(5)'s amendment. SKF USA contends that the conduct outlined above served effectively to amend Article III(5) to read, in pertinent part, as follows:

> (5) *Compensation* An annual retainer fee may be paid [to] *outside* directors, as determined by resolution of the Board of Directors. In consideration of his past service as a director and his continued availability as a consultant to render advice to the Board, a[n] *outside* director, upon his retirement from the Board at age 70, shall be eligible to receive the annual retainer paid him at the time of his retirement, for life, provided he shall have had at least five years of continuous service as a[n] outside director. If a[n] *outside* director shall retire from the Board prior to age 70, he shall be eligible to receive one-half of the annual retainer paid him at the time of his retirement, for life, provided he shall have had at least five years of continuous service as a[n] *outside* director.

Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 19–20 (words resulting from putative amendment emphasized).

█ In considering how SKF USA's course of conduct served to amend Article III(5), we first observe that SKF USA is attempting to demonstrate that its pattern of *not* doing something—in specific, not paying benefits to someone situated similarly to Franklin—amounts to a positive course of action. Recall from our discussion above that in order to have amending effect, the "custom or usage" must be "definite and uniform", and must not be "in accord with the by-laws regularly adopted," *Ivey & Ellington,* 42 A.2d at 509, and also that the proponent of the amendment bears the burden of showing the existence of sufficient amending conduct, *Belle Isle Corp.* 49 A.2d at 8.

Here, SKF USA maintains that it engaged in two separate courses of conduct that served to amend Article III(5). First, it didn't pay the annual retainer fee to inside directors, and, second, it didn't pay post-retirement compensation to anyone except outside directors and also had never paid post-retirement compensation to anyone who had ever been an inside director. The question, though, is whether these courses of "negative" conduct—that is, of not doing certain things—serve to provide a conduct that positively amends the bylaws.

█ In examining this, we conclude that mere inaction will not suffice to have such effect. Instead, in order for negative conduct to have a positive amending effect, it must be the case that the corporation had the *opportunity* to do something but *declined* to do so. There is a simple logical reason for this finding: not doing something is only apparent when one might otherwise be expected to do it.[28]

█ This logic, in turn, dovetails with two of the legal requirements for "course of conduct" amendments. The first is that in order for a court to conclude that conduct has had an amending effect on the bylaws, the court must be able to make the inference that the shareholders, or the body with power to amend the bylaws,[29] has acquiesced in the conduct. But acquiescence in inaction can only logically be inferred if the acquiescing party could readily perceive that the action was not being taken. And this leads us to the

---

**28.** That is, for example, the negative statement, "I never hit my brother", only has positive content if I in fact have a brother.

**29.** As detailed above, the Delaware case laws identifies both of these bodies as the applicable "audience" for a course of conduct that amends the bylaws, *Osteopathic Hosp. Ass'n,* 195 A.2d at 762 (stating that the relevant group is "those authorized to enact" the bylaws), *Ivey & Ellington,* 42 A.2d at 509 (stating that the relevant group is the stockholders).

other legal requirement that confirms that a "negative" course of conduct can only serve to amend a bylaw where the corporation had the opportunity to take action but did not. This is the requirement that the course of conduct be not in accordance with the formally adopted bylaws. That is, in the case of negative conduct, it must be the failure to do something that the bylaws affirmatively require. This is exactly analogous to our general finding that amending effect comes from negative conduct that the corporation had the opportunity to perform but did not.

■ With these principles in mind, we now turn to examine SKF USA's conduct here. We begin with the practice of not paying annual retainers to inside directors, and we have little difficulty in concluding that this conduct did have the effect of amending Article III(5). For one thing, SKF USA clearly had the opportunity to pay annual retainers to its inside directors, but declined to do so. As outlined above, SKF USA gives a number of examples of inside directors who were not in fact paid the retainer. Similarly, the conduct was clearly contrary to the requirements of Article III(5): Article III(5) states that "directors", without distinction, are to receive annual retainer fees, and the failure to do so cannot be interpreted as anything but contrary to this requirement. We thus can conclude that SKF USA has effectively amended the first part of Article III(5) to provide that only outside directors are eligible for the annual retainer fee.[30]

■ However, we cannot come to the same conclusion with respect to the second part of Article III(5), dealing with post-retirement compensation. With respect to *this* provision, SKF USA first points to its course of conduct whereby no inside director received post-retirement compensation. In so claiming, it is notable that SKF USA points to no occasion in which it had an opportunity to pay such compensation in accordance with Article III(5) but refused to do so. The only individual to whose treatment SKF USA refers in this regard is F. James Skinner, who retired from the Board in 1985. There is no dispute, however, that Skinner was not, at the time he retired, in receipt of any annual retainer fee. Therefore, pursuant to the plain provisions of Article III(5), he was not in a position to receive any post-retirement compensation (which would have been, depending on his age, either the amount of that retainer or one-half of it). Therefore, the failure to pay Skinner did not contravene the then-existing bylaw's requirements. Moreover, it is difficult for us to see how the decision to refuse to pay post-retirement compensation to a single individual could provide the "definite and uniform custom and usage" necessary to have the requisite amending force.

We next consider the course of conduct evidenced by the statements of SKF USA's directors and officers to the effect that post-retirement income has never been paid to anyone who at any point had served as an inside director of SKF USA. But this "negative" action also fails to establish an amending course of conduct because there is nothing to show that this pattern required any behavior visibly con-

---

**30.** In coming to this conclusion, we also find that SKF USA meets the requirements for the duration of the conduct and the inference of acquiescence of the shareholders or entity with the power to enact the bylaws. The conduct of not paying "inside" directors the annual retainer began in 1976, when Article III(5) was first amended to permit such payments, and continued through at least 1999. This was certainly a sufficient period to put both the Board of Directors itself (the body empowered to enact the bylaws, pursuant to the corporation's Articles of Incorporation, Ex. 8, Def.'s Mot. for Summ. J. at SKF00008) as well as the shareholders. We feel particularly safe in this conclusion given that AB SKF held over 95% of SKF USA's stock and that it appears that AB SKF itself, as the major shareholder, had from time to time a role in determining the amount of the annual retainer fee, Ex. 17, Def.'s Mot. for Summ J. at SKF00266 (minutes of Board meeting of May 26, 1988, noting that "the major shareholder had decided that the annual retainer paid to board members be increased from $10,000 to $12,500").

trary to the requirements of the bylaws.[31] Again, in order to be eligible for post-retirement compensation pursuant to the letter of Article III(5), a director must meet two requirements: he must have five years of continuous service and he must be, at the time of his retirement, in receipt of an annual retainer fee. The mere fact that SKF USA never paid post-retirement compensation to anyone who had ever served as an inside director means nothing for amendment purposes if there was never such a person who otherwise met the requirements to receive such payments.

Similar reasoning obtains with respect to the fact that SKF USA has only paid post-retirement compensation to outside directors. This reality would only have significance to the extent that there were inside directors who met the dictates of the bare text of Article III(5) but who were denied compensation. This is so because the fact that the only recipients of post-retirement compensation happen to have been outside directors is itself not contrary to the letter of Article III(5), and therefore the practice could not have served notice that the bylaws had been in some way amended.[32]

We therefore conclude that SKF USA's course of conduct with respect to post-retirement compensation was insufficient to amend the post-retirement compensation provisions of Article III(5) by implication, as SKF USA, which has the burden of establishing the course of conduct, has failed to show that the conduct engaged in was in fact contrary to the regularly amended text of Article III(5).

### 3. Resulting Interpretation of Article III(5)

We have concluded above that SKF USA effectively amended the first portion of bylaw Article III(5) to provide that the annual retainer fee would not be paid to inside directors. We have also concluded, however, that SKF USA's course of conduct with respect to director's post-retirement compensation was not sufficient under the Delaware standards for amendment by implication to amend the second portion of Article III(5) dealing with directors' post-retirement compensation. Therefore, since the post-retirement compensation portion of Article III(5) has not been amended, we must, under Delaware law, "construe the bylaw as it is written, and we give language which is clear, simple, and unambiguous the force and effect required," *Hibbert*, 457 A.2d at 343.

The text of that second portion of Article III(5), as it pertains to Franklin[33], states: "If a director shall retire from the Board prior to age 70, he shall be eligible to receive one-half of the annual retainer paid him at the time of his retirement, for life, provided he shall have had at least five years continuous service as a director." Ex. 11, Def.'s Mot. for Summ. J. at SKF00122. We find that this language is straightforward and unambiguous, and

---

**31.** We note that Franklin's evidently anomalous situation has played a role here. He may well be the only person for whom SKF USA's "course of conduct" amendment for the first part of Article III(5) did not also effectively mean an ineligibility for post-retirement compensation as well. Franklin was once an inside director, but then, when his employment changed, became an outside director eligible for the annual retainer. As discussed below, the fact that he was receiving this retainer at the time of his retirement is a prerequisite for his eligibility for the post-retirement compensation, and it is this fact that apparently differentiates him from the other one-time inside directors of SKF USA.

**32.** A brief thought experiment helps to show why this evidence is not a good demonstration that the bylaws have been amended. Note that from the posited course of conduct with respect to post-retirement income, we could also conclude that the Board had by its course of conduct amended the bylaws to deny post-retirement benefits to *female* directors, since it would appear equally true that no female director has ever received post-retirement benefits and that all the directors who have in fact received such benefits were men.

**33.** There is no dispute that Franklin was 59 years old when he retired as a director.

must be interpreted to mean that a director of SKF USA is eligible to be paid post-retirement income for the remainder of his life, in the annual amount of one-half of the annual retainer that SKF USA paid him at the time he retired, if that director meets three conditions: (1) he retires from the Board, (2) he retires before reaching the age of seventy, and (3) he served as a director of SKF USA for at least five consecutive years.

### D. *Application of the Amended Article III(5) to H. Clive Franklin*

While we have found that SKF USA did amend the first portion of bylaw Article III(5), addressing the payment of the annual director's retainer fee, through a course of conduct, Franklin has made no claim here for any compensation due him as a sitting director. We therefore need not examine how the amended portion of Article III(5) applied to Franklin.

Franklin does make a claim for post-retirement compensation. In line with our interpretation of the applicable post-retirement compensation provision of Article III(5), it is undisputed that: (1) Franklin retired from SKF USA's Board of Directors, (2) he was less than seventy years of age at the time that he retired, and (3) at the time of his retirement, he had served continuously as a director of SKF USA from October 18, 1985 to March 30, 1993, a period in excess of five years. On these facts, and on the interpretation of Article III(5) at which we arrived above, we conclude that SKF USA was and is obligated to pay Franklin, in accordance with Article III(5), "one-half of the annual retainer paid him at the time of his retirement, for life." Also in accordance with language in Article III(5) [34], these annual payments are to be paid quarterly.

### E. *Damages*

Having determined that SKF USA must pay Franklin "one-half of the annual retainer paid him at the time of his retirement, for life," we still must translate this into dollars. The parties differ on several issues surrounding this obligation. First, they diverge on the magnitude of the "annual retainer" that Franklin was receiving at the time of his retirement. Second, they differ on the extent to which SKF USA must render unto Franklin past-due post-retirement compensation from the years 1993 to the present (the dispute here centers on the effect of the statute of limitations). Third, they dispute the manner in which future payments of Franklin's post-retirement compensation should be paid in the wake of this action.

### 1. *Amount of the "Annual Retainer"*

Franklin maintains that the annual retainer he received prior to his retirement was $17,500, Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. at 13. Although Franklin cites no exhibit in support of this statement, its origin appears to be Franklin's own affidavit: "At the time of my resignation I was receiving yearly fees of $17,500.00. I do not recall ever being advised that my fee was broken down as $12,500.00 for a retainer and $5,000.00 for attendance fees," Ex. C, Pl.'s Mot. for Summ. J. (Affidavit of H. Clive Franklin) ¶ 10.[35] Conversely, SKF USA maintains that at the time of his retirement, Franklin's annual retainer was only $12,500.

■ On the undisputed record before us, we find that Franklin's annual retainer at the time of his retirement was $12,500.[36] We first observe that from the inception of annual payments to SKF USA directors,

---

**34.** Language that is not the subject of any dispute between the parties.

**35.** Franklin's affidavit is interesting on this point, since he himself claims that SKF USA's only evidence that the retainer was $12,500 is the corporation's "self-serving accounting

records", Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 4 n. 1.

**36.** To the extent that there is any dispute of material fact on this issue, we find that no reasonable jury could reach a contrary conclusion.

such payments were seen as distinct from the fees that those directors received for attending meetings. Clear evidence of this may be found in the text of Article III(5) as it was amended in 1976, at which point the provision read: "An annual retainer fee may be paid directors, as such, for their services, as determined by resolution of the Board of Directors. *In addition,* a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of such Board...." Ex. 12, Def.'s Mot. for Summ. J. at SKF00164 (emphasis added). While later amendments of Article III(5) deleted the reference to the meeting payments, the reference to the annual retainer fee remained in the singular: "An annual retainer fee may be paid directors...." Ex. 13, Def.'s Mot. for Summ. J. at SKF00181 (Article III(5) as amended on Feb. 13, 1984). This shows that the retainer fee was a unitary fee and not one dependent on attendance at a series of meetings.

Other references to the "annual retainer" in minutes of Board of Director meetings demonstrate that this term referred to the annual payment only and not to the total of such an annual payment plus the payments for meeting attendance. For example, the minutes of the Board meeting of May 26, 1988 state that, "[The Chairman of the Board] reported that the major shareholder had decided that the annual retainer paid to board members be increased from $10,000 to $12,500." Ex. 17, Def.'s Mot. for Summ. J. at SKF00266. We also note that SKF USA's accounting records, Ex. 21, Def.'s Mot. for Summ. J.[37], reflect a differentiation between the annual "fee", paid quarterly at an annual rate of $12,500, and other fees for attendance at various meetings.[38]

On the basis of this undisputed evidence, we conclude that the reference to the "annual retainer" in the post-retirement compensation provision of Article III(5) refers exclusively to the fixed annual payment made to directors, and not to a combination of such a fixed fee and various meeting fees. We further find that the amount of this annual retainer was $12,500 at the time Franklin retired.[39] Consequently, as we have found above that SKF USA owes

**37.** This exhibit includes, *inter alia,* the accounting spreadsheets for 1992 and 1993 reflecting the payments made to Franklin.

**38.** We also note that the very use of the term "retainer" tends to show that term is a reference to the annual payment rather than to the payments for each meeting, since the applicable definition of *retainer* is "A sum paid to secure special services if required," XIII *Oxford English Dictionary* 770 (2d ed.1989) (def.3b).

**39.** We recognize that in his affidavit Franklin states that he does not "recall ever being advised" that his fee was composed of an annual retainer and meeting fees. As an initial matter, we note that this statement does not serve in any way to dispute the facts presented elsewhere in the record that we have examined in reaching our conclusions regarding the extent of the "annual retainer". Whether Franklin was aware or was made aware of the fact that his total compensation as a board member comprised several different types of fees would not in any event serve to alter the meaning of "annual retainer" as used in Article III(5). As we have elaborated in the text, it is clear that the term "annual retainer" referred exclusively to the fixed annual $12,500 payment made to each eligible director. Moreover, we observe that the record reflects that Franklin himself was advised in correspondence that he would receive, as an SKF USA director, an annual fee of $12,500, Ex. 40, Def.'s Mot. for Summ. J. (letter of Feb. 26, 1992 from Olle Ranang, Group Personnel Director, to Clive Franklin) (stating "As a Board member of SKF USA, Inc you have a fee of 12 500 USD from 1992–01–01. The amount will be paid in December."). Franklin also received correspondence with regard to his 1993 correspondence that reported to him that his total payment of $4,250 was composed of $3,125 as the "Annual Retainer Fee" and $1,125 for a "Board Meeting", Ex. 30, Def.'s Mot. for Summ. J. at SKF01157 (letter of May 21, 1993 from Brandt N. Earhart, Manager–Cash Management and Salary Payroll, to Clive Franklin). Again, however, the issue of whether Franklin was advised of this breakdown is not material to the question of the meaning of the term "annual retainer" as used in Article III(5).

Franklin post-retirement compensation equaling an annual payment of one-half the annual retainer, we find that the annual payment owed Franklin as post-retirement compensation is $6,250.

### 2. *Extent to Which SKF USA Must Make Past–Due Payments*

The parties also do not agree on the extent to which SKF USA must make good to Franklin on post-retirement compensation payments that should have, but were not, made between his retirement on March 30, 1993 and the present. Franklin argues that Article III(5) represents a "continuing contract", and that therefore under Pennsylvania law the otherwise applicable statute of limitations does not run for payments due under that continuing contract. Consequently, Franklin maintains, SKF USA must make good on every quarterly post-retirement compensation payment that has been due since March 30, 1993 to the present. Conversely, SKF USA argues that Article III(5) is not a continuing contract and therefore, applying the four-year Pennsylvania statute of limitations, SKF USA should not be liable for those post-retirement compensation payments due prior to February 3, 1996.[40]

Franklin relies on the "continuing contract" theory as set forth in *Thorpe v. Schoenbrun,* 202 Pa.Super. 375, 195 A.2d 870, 872 (1963):

> The statute of limitations begins to run in the case of contracts when the action accrues or arises, which is when there is an existing right to sue forthwith on the breach of the contract.

> In general, the statute of limitations does not run against a contractual cause of action which is a continuing one. On a continuing contract which is entire, the statute of limitations begins to run only from the time when the breach occurs or the contract is in some way terminated.

> The test of continuity, so as to take the cause out of the operation of the statute of limitations, is to be determined by the answer to the question whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts.

> If services are rendered under an agreement which does not fix any certain time for payment or for the termination of the services, the contract will be treated as continuous, and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties.

*Thorpe,* 195 A.2d at 872 (citations omitted).

A close examination of this standard demonstrates that the "contract" here is not a continuing contract under *Thorpe* and that therefore the statute of limitations applies. Under the *Thorpe* standard, the crucial question is "whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts." We immediately observe that in this case, there certainly were "definite times" set for payment: according to Article III(5), payments of post-retirement compensation for directors are to be made quarterly, following retirement. Moreover, *Thorpe* states that even for a continuing contract, the statute of limitations begins to run from the date of a breach, and it seems clear that SKF USA's failure to begin making post-retirement compensation payments to Franklin in 1993 constitutes a breach. *Cf. Refac Financial Corp. v. Patlex Corp.,* 912 F.Supp. 159, 162–63 (E.D.Pa.1996) (finding that the "continuing contract" theory did not apply to a patent licensing agreement that called for a stream of royalty payments).[41]

---

**40.** That is, four years prior to the filing of this action.

**41.** Franklin maintains that there is a "continuous contract" here because Article III(5) notes that the post-retirement compensation is "in consideration" not only of the director's

Having concluded that there is no continuing contract here, we observe that the parties are in agreement as to the alternative, namely that the four year Pennsylvania statute of limitations applies and that SKF USA is therefore liable for payments that should have been made since February 3, 1996.[42] Similarly, both parties agree upon the calculation of the number of payments due since that date,[43] and we conclude based on this agreement that as of this date there are nineteen quarterly payments that have come due since February 3, 1996.

### 3. The Nature of Payment for Future Post–Retirement Compensation Payments

Franklin seeks an award of future benefits based upon his projected life expectancy of 16.5 years, and Franklin arrives at the corresponding dollar value by multiplying that 16.5 year span by the annual amount he is owed by SKF USA. SKF USA, conversely, argues that any such award must be discounted to present value in order to avoid requiring it to pay damages greater in value than the actual payments owed.

We need not resolve this dispute. We have found above that Article III(5) requires SKF USA to pay to Franklin, for life, an annual amount of $6,250. We find that there is no reason here to attempt to reduce this future obligation to a sum to be paid today,[44] and shall instead order SKF USA to pay the ongoing future benefits in accordance with Article III(5).

### ORDER

AND NOW, this 21st day of December, 2000, upon consideration of the plaintiff's motion for summary judgment (docket number 10), and the defendant's response thereto, and the defendant's motion for summary judgment (docket number 9), and plaintiff's response thereto, and for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1. Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART;

2. Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART;

3. JUDGMENT IS ENTERED for plaintiff H. Clive Franklin and against defendant SKF USA Inc. in the amount of $29,687.50;

4. Defendant shall, commencing on January 1, 2001, pay to plaintiff director's post-retirement compensation in the amount of $6,250.00 per year, to be paid in accordance with the provisions of Article III, section 5 of the defendant's bylaws as it was in effect on March 30, 1993; and

5. The Clerk shall CLOSE this case statistically.

---

past service, but also his "continued availability as a consultant to render advice to the Board." While Article III(5) does so provide, it is nonetheless the case that there is a definite time set for payment, and that consequently Article III(5) fails the *Thorpe* test for a "continuing contract".

**42.** *See Ritter v. Theodore Pendergrass Teddy Bear Prods. Inc.,* 356 Pa.Super. 422, 514 A.2d 930 (1986) (holding that as each payment of a payment stream becomes due, a separate cause of action accrues).

**43.** Both agree that there were 17 quarterly payments due as of June 2000.

**44.** No one questions SKF USA's continuing financial viability. Sven Wingqvist founded SKF in 1907, and this worldwide company, with ninety factories and 44,000 employees, continues to enjoy enviable profitability. *See* "SKF History" at <http://www.skf.com/group/history.html>.