**JODEK CHARITABLE TRUST, R.A., Plaintiff,**

v.

**VERTICAL NET INC. et al., Defendants.**

**No. Civ.A. 04–CV–4455.**

United States District Court, E.D. Pennsylvania.

Jan. 26, 2006.

Kenneth J. Lafiandra, Joshua A. Gelman, Jacobs Law Group, PC, Neal A. Jacobs, Neal A. Jacobs & Associates PC, Philadelphia, PA, for Plaintiff.

Glenn A. Weiner, Lisa A. Lori, Klehr Harrison Harvey Branzburg & Ellers, LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

## I. INTRODUCTION [1]

Jodek Charitable Trust, R.A. ("Jodek") brings this diversity action against VerticalNet Inc. ("VerticalNet"), American Stock Transfer and Trust Company ("ASTT"), James McKenzie, Esq. ("McKenzie"), Mark L. Walsh ("Walsh"), and Douglas A. Alexander ("Alexander") (collectively "Defendants"). The origin of this dispute is a March 2000 merger between two companies, Defendant VerticalNet and nonparty Tradeum, Inc. ("Tradeum"). Plaintiff Jodek is the assignee and successor in interest to the original shareholders of Tradeum. Plaintiff's Amended Complaint alleges ten counts, including breach of contract, various tort claims, and violations of the Uniform Commercial Code.[2] Before me is the Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants also move to strike the Ad Damnum clause of Plaintiff's Amended Complaint for failure to comply with Local Rule of Civil Procedure 5.1.1. For the reasons that follow, I will grant Defendants' motion in part, deny it in part with prejudice, and deny it in part without prejudice. In addition, I will grant Defendants' motion to strike.

## II. JURISDICTION

Plaintiff Jodek is a citizen of the state of Israel and all defendants are citizens of Pennsylvania, with the exception of Defendant ASTT, which is a citizen of New York. Thus, this case falls within my diversity jurisdiction.[3] 28 U.S.C. § 1332.

## III. FACTUAL BACKGROUND [4]

### A. Parties

Plaintiff Jodek is a nonprofit organization formed under the laws of Israel.

---

1. This case was transferred to me from the docket of the late Hon. James McGirr Kelly.

2. Count I: breach of contract against VerticalNet;

Count II: conversion and trover against VerticalNet

Count III: breach of contract as third-party beneficiary against ASTT

Count IV: breach of fiduciary duty against VerticalNet, McKenzie, Walsh, and Alexander

Count V: equitable fraud against all defendants

Count VI: equitable estoppel against all defendants

Count VII: negligence against all defendants

Count VIII: violation of the UCC against VerticalNet and ASTT

Count IX: negligent misrepresentation against McKenzie

Count X: negligent supervision against VerticalNet, McKenzie, Walsh, and Alexander

3. There is no indication whatsoever that any assignment of claims to Plaintiff Jodek was "improperly or collusively made ... to invoke the jurisdiction" of this Court. 28 U.S.C. § 1359.

4. In deciding a motion to dismiss, I must accept as true the allegations of the complaint and draw all reasonable inferences in the Plaintiff's favor. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996).

(Am.Compl.¶ 18.) Jodek brings suit "individually," as assignee of Zvi Schreiber ("Schreiber") and as successor in interest to several entities owned by Schreiber: Schreiber, LLC, K.F.G. Trust, and Wyoma Investments.[5] (*Id.* ¶¶ 19–23.) Zvi Schreiber was the founder and principal of Tradeum, a Delaware corporation in the business of "designing digital marketplace software for business-to-business e-commerce communities." (*Id.* ¶¶ 24–25.) Defendant VerticalNet is a Pennsylvania corporation and a citizen of Pennsylvania. (*Id.* ¶ 26.) At all times relevant to this lawsuit, VerticalNet "was the owner and operator of a few dozen industry-specific web sites designed as online business-to-business communities, known as vertical trade communities." (*Id.* ¶ 27.) Defendant Walsh is a citizen of Pennsylvania who served, at all times relevant to this lawsuit, as president and CEO of Vertical-Net and as a member of its board of directors. (*Id.* ¶ 30.) Defendant Alexander is a citizen of Pennsylvania who served, at all relevant times, as chairman of VerticalNet's board of directors. (*Id.* ¶ 31.) Defendant McKenzie is a citizen of Pennsylvania who served, at all relevant times, as general counsel and an officer of VerticalNet. (*Id.* ¶ 29.) Defendant ASTT is a New York corporation and a citizen of New York. (*Id.* ¶ 28.) VerticalNet retained ASTT as its agent with respect to various stock transfer matters arising out of the merger between Tradeum and VerticalNet. (*Id.*)

## B. *The Merger*

On or about March 8, 2000, Tradeum and VerticalNet entered into an Agreement and Plan of Merger (the "Merger Agreement").[6] (*Id.* ¶ 33.) In addition to the main Merger Agreement, Tradeum and VerticalNet executed several other agreements defining the parties' respective rights and obligations regarding the merger of Tradeum and VerticalNet, including a Registration Rights Agreement (Am. Compl.Ex. D) and a Lock–Up Agreement (Am.Compl.Ex. E). Upon completion of the merger, Tradeum was to become a wholly owned subsidiary of VerticalNet. (*Id.* ¶ 36.) As consideration, the Schreiber parties were immediately to receive a total of 601,696 shares of VerticalNet stock and an additional 89,909 shares of VerticalNet stock in escrow (collectively the "Merger Stock").[7] (*Id.* ¶ 38.)

Under the terms of the Merger Agreement and its amendment, the Schreiber parties were contractually free to divest themselves of 381,443 shares of the Merger Stock upon its registration by Vertical-Net and ASTT. (*Id.* ¶ 40.) The remaining 220,253 shares of Merger Stock that were not in escrow were "locked up," and the Schreiber parties could only divest themselves of these shares "as certain performance and/or time-based milestones contained in the Lock–Up Agreement ... were achieved." (*Id.* ¶ 41.) Under the Merger Agreement, the Schreiber parties could not divest themselves of the 89,909 shares of escrowed Merger stock for at least one year. (*Id.* ¶ 42.) It was the Schreiber parties' intention to sell the Merger Stock on the public market as soon as possible after acquiring it. (*Id.* ¶¶ 43–47.)

**5.** I will refer to Schreiber and these three entities collectively as the "Schreiber parties."

**6.** On March 23, 2000, the Merger Agreement was amended by "Amendment No. 1 To Agreement and Plan of Merger" (the "Merger Agreement Amendment"). (Am. Compl. ¶ 33 n. 1.)

**7.** Only 40,743 shares of escrowed Merger Stock were ultimately released because VerticalNet made a claim against the escrow stock to cover a debt. (*Id.* ¶ 42.)

## C. *The First Alleged Delay*

On or about March 24, 2000, the Schreiber parties attempted to sell the first 381,443 shares of the Merger Stock, but were prohibited from doing so because Defendants had not yet issued share certificates or filed a Form S–3 Registration Statement. (*Id.* ¶¶ 48–49.) The Registration Rights Agreement provided, *inter alia,* for the Defendants' filing a Form S–3 Registration Statement and causing it to become effective. (*Id.* ¶ 39.) The Schreiber parties requested that the Defendants issue share certificates and file a registration, and continued in its request over a period of approximately two months. (*Id.* ¶ 50.) Defendants repeatedly advised the Schreiber parties that the problem would be remedied. (*Id.* ¶ 51.) Defendants eventually registered the Merger Stock on May 24, 2000. (*Id.* ¶ 53.) In the two months during which the Schreiber parties were unable to sell these shares, the Merger Stock's value declined from $125 to $37.50 per share. (*Id.* ¶ 56.) After the issuance of stock certificates and the filing of registrations, the Schreiber parties sold 381, 443 shares of the Merger Stock at $37.50 per share. (*Id.* ¶ 57)

## D. *The Second Alleged Delay*

On or about June 13, 2000, in response to an Israeli tax ruling, the Schreiber parties transferred the unsold balance of Merger Stock they currently controlled to K.F.G. Trust. (*Id.* ¶ 59.) To become effective, this transfer would require the issuance of new share certificates and the filing of an updated and/or amended registration statement by Defendants. (*Id.* ¶ 60.) The Schreiber parties provided Defendants with the information necessary to re-issue the share certificates and update the registration. (*Id.* ¶ 61.) When the Defendants did not do so, the Schreiber parties made repeated demands on them, and were repeatedly told that the matter would be taken care of. (*Id.* ¶¶ 64–65.) Specifically, on June 22, 2000, Schreiber sent an email to Defendant McKenzie requesting that Defendants update the registration and re-issue the share certificates, to which McKenzie responded "We will help you out here to make this happen...." (*Id.* ¶¶ 66–67.) Defendants eventually took the required actions on January 26, 2001. (*Id.* ¶ 71.) The Schreiber parties were able to sell 109,250 shares of the Merger Stock on February 12, 2001, after obtaining relevant opinions. (*Id.*) In the six months during which the Schreiber parties were unable to sell these shares, the Merger Stock's value declined from $50 to $3.55 per share. (*Id.* ¶ 74.) The Schreiber parties sold 109,250 shares of the Merger Stock at $3.55 per share. (*Id.* ¶ 75.)

## E. *The Third Alleged Delay*

On or before June 2000, the Schreiber parties met the milestones specified in the Lock–Up Agreement as prerequisites to the release and registration of the balance of the 220,253 "locked-up" shares.[8] (*Id.* ¶¶ 77–78.) Defendants did not release the locked-up stock or send any communication to the Schreiber parties confirming that the milestones had been achieved. (*Id.* ¶ 79–80.) In the time during which the Schreiber parties were unable to sell these shares, the Merger Stock's value declined. (*Id.* ¶ 82.) Between March and June 2001, although Defendants still had not confirmed that the milestones in the Lock–Up Agreement had been reached, the Schreiber parties sold the locked-up Merger Stock

---

8. The Lock–Up Agreement provided for the release of locked-up shares of the Merger Stock upon the passage of certain anniversaries of the signing of the Merger Agreement or upon the occurrence of certain triggering events. (Am. Compl. ¶ 41 n. 3.)

at prices between $1 and $2.50 per share. (*Id.* ¶ 80.)

### F. *The Fourth Alleged Delay*

On or before March 2001, the Schreiber parties had met all of the contractual prerequisites for the release of any escrowed shares of the Merger Stock, other than those shares that had been claimed to cover a debt. (*Id.* ¶ 85.) The Defendants did not release and register the remaining 40,743 shares of escrowed Merger Stock until May 2001. (*Id.* ¶ 87.) In the time during which the Schreiber parties were unable to sell these shares, the Merger Stock's value declined to less than $2.28 per share. (*Id.* ¶ 89.)

On September 19, 2004, Zvi Schreiber assigned to Jodek any and all claims that he or Schreiber, LLC may have had against VerticalNet, ASTT, and any of VerticalNet's officers or directors. (Am. Compl. Ex. A at 1.) On September 21, 2004, Jodek brought this action.

### IV. LEGAL STANDARD

Defendants filed this motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). A court may dismiss a complaint only if it appears that the plaintiff "could prove no set of facts that would entitle him to relief." *Alston v. Parker,* 363 F.3d 229, 233 (3d Cir.2004). A court must accept all of the plaintiff's allegations as true and attribute all reasonable inferences in his favor. *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996).

■■■ One of the grounds on which Defendants move to dismiss pursuant to Rule 12(b)(6) is that Plaintiff's claims are time-barred under the applicable statute of limitations. A statute of limitations defense may be raised by motion under Rule 12(b)(6) if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Hanna v. United States Veterans Admin. Hosp.,* 514 F.2d 1092, 1094 (3d Cir.1975). However, because the applicability of the statute of limitations often involves questions of fact for the jury, the moving party "bear[s] a heavy burden in attempting to establish as a matter of law that the challenged claims are time-barred." *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 425 (3d Cir.1999). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bethel v. Jendoco Constr. Corp.,* 570 F.2d 1168, 1174 (3d Cir.1978).

### V. DISCUSSION

■■■ A federal district court sitting in diversity must apply the substantive law of the state whose law governs the action. *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1373 n. 15 (3d Cir.1996) (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Here, the parties agree that Pennsylvania law governs this dispute. In deciding state law issues, I must apply state law as interpreted by the state's highest court. *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.,* 316 F.3d 431, 443 (3d Cir.2003). "When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue." *Orson,* 79 F.3d at 1373 n. 15. "Absent a definitive statement of the applicable law by the state's highest court, a district court may also consider the decisions of state intermediate appellate courts in order to facilitate its prediction." *Paolella v. Browning–Ferris, Inc.,* 158 F.3d

183, 189 (3d Cir.1998) (internal citations omitted).

### A. *Breach of Contract Claims*

Counts I and III of Plaintiff's Amended Complaint allege breach of contract by VerticalNet and ASTT, respectively. The sole grounds on which Defendants seek dismissal of these counts is the statute of limitations. Defendants concede that any 12(b)(6) dismissal of Counts I and III on this basis could be at most partial, because the face of the complaint alleges certain breaches falling clearly within the four-year statute of limitations applicable to breach of contract actions in Pennsylvania. *See* 42 Pa. Cons.Stat. Ann. § 5525(a). Specifically, Defendants admit that Plaintiff has pleaded that the "third alleged delay" and "fourth alleged delay" occurred within the four-year limitations period. (Defs.' Mot. Dismiss at 18 n. 17.) Thus, Defendants' motion is addressed solely to the first and second alleged delays.

While the face of the complaint shows that the first and second alleged delays occurred outside the limitations period, Plaintiff argues that an action based on these delays is nonetheless timely under the "continuing contract" doctrine. *See Thorpe v. Schoenbrun*, 202 Pa.Super. 375, 195 A.2d 870, 872 (1963); *Wm. B. Tenny, Builder and Developer v. Dauphin Deposit Bank & Trust Co.*, 302 Pa.Super. 342, 448 A.2d 1073, 1075 (1982). Under the continuing contract doctrine as recognized under Pennsylvania law,

> [i]n general, the statute of limitations does not run against a contractual cause of action which is a continuing one. On a continuing contract which is entire, the statute of limitations begins to run only from the time when the breach occurs or the contract is in some way terminated. The test of continuity, so as to take the cause out of the operation of the statute of limitations, is to be determined by the answer to the question whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts.
>
> If services are rendered under an agreement which does not fix any certain time for payment or for the termination of the services, the contract will be treated as continuous, and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties.

*Thorpe*, 195 A.2d at 872 (internal citations omitted). The question of whether the continuing contract doctrine applies to this case is a factual question that cannot properly be decided from the face of the complaint.[9] *See Bethel*, 570 F.2d at 1174 (untimeliness must be apparent from the face of the complaint to dismiss under Rule 12(b)(6)). Accordingly, with respect to Counts I and III of the Amended Complaint, I will deny Defendants' motion to dismiss without prejudice to raise all the issues raised in the motion at a later stage of the litigation, after discovery.

In doing so, I reject Defendant's argument that it is immaterial whether one or more of the contracts at issue was a "continuing contract" because the statute of

---

9. *See Thorpe*, 195 A.2d at 871 (issue of whether contract was continuing submitted to jury as question of fact). Indeed, neither party has cited any case, nor has my research discovered any, where a suit raising a "continuing contract" question was dismissed on a 12(b)(6) motion. *See Gannon v. Amtrak*, 2004 WL 1274384 (E.D.Pa. May 27, 2004) (denying 12(b)(6) motion); *Welch Foods Inc. v. Borough of North East*, 2001 WL 311204 (W.D.Pa. Feb.6, 2001) (denying motion for leave to amend complaint); *Franklin v. SKF USA Inc.*, 126 F.Supp.2d 911 (E.D.Pa.2000) (granting partial summary judgment); *Refac Fin. Corp. v. Patlex Corp.*, 912 F.Supp. 159 (E.D.Pa.1996) (granting summary judgment).

limitations would still run from the date of breach, and not from the termination of the parties' contractual relationship. This argument simply does away with the principal distinction between contracts that are considered "continuing" under Pennsylvania law and those that are not. Defendants' argument is based solely on the following sentence in *Thorpe:*

> On a continuing contract which is entire, the statute of limitations begins to run only from the time when the breach occurs or the contract is in some way terminated.

195 A.2d at 872. Defendants would have me read this sentence as meaning "from the time when the breach occurs or the contract is in some way terminated, *whichever comes first.*" Yet such a reading would be contradictory to both the language of *Thorpe* and its reasoning.[10] First of all, in the very next paragraph, the court went on to state:

> If the services are rendered under an agreement which does not fix any certain time for payment or for the termination of the services, the contract will be treated as continuous, *and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties.*

*Id.* (emphasis added). This language directly contradicts Defendants' interpretation and indicates that the statute of limitations on a continuing contract runs from the termination of the parties' contractual relationship. *See Tenny,* 448 A.2d at 1074–75 (reversing grant of summary judgment because of outstanding factual issue of whether contract was continuing, even though breach occurred outside limitations period).

Furthermore, even a cursory reading of *Thorpe* reveals that the continuing contract doctrine is meant to carve out an exception to the general rule that the statute of limitations begins to run on the date of breach. *Thorpe* involved a breach of contract action by a doctor against a patient for failure to pay for certain treatments. 195 A.2d at 873. There was no question that most, if not all of these treatments occurred outside of the limitations period, as did the patient's initial failure to pay. *Id.* at 871, 873. However, in upholding the jury's verdict for the doctor, the Superior Court found that there was sufficient evidence of an ongoing contractual relationship that continued into the limitations period, and thus that the statute of limitations did not bar the claim. *Id.* at 872. If the court had in fact held that the statute of limitations runs from breach or termination of the relationship, *whichever comes first, Thorpe* would have to have been decided differently. Indeed, because in any breach of contract action, the breach almost always occurs before the termination of the parties' contractual relationship, Defendants' reading of *Thorpe*

---

**10.** Some federal district court decisions have adopted Defendants' reading of this sentence in *Thorpe,* usually only as dicta in cases where the reasoning of *Thorpe* led to the same conclusion. *See, e.g., Franklin,* 126 F.Supp.2d at 911 ("A close examination of this standard demonstrates that the 'contract' here is not a continuing contract under *Thorpe* and that therefore the statute of limitations applies.... Moreover, *Thorpe* states that even for a continuing contract, the statute of limitations begins to run from the date of a breach ....''); *see also Welch Foods,* 2001 WL 311204, at *8 (also dicta); *but see Refac,* 912 F.Supp. at 162 (not dicta). However, Defendants cite no Third Circuit or Pennsylvania case that supports their reading of *Thorpe.* To the extent that one or more federal district court decisions read *Thorpe* differently, they are not binding on me and I do not find them persuasive. *Samuel–Bassett v. KIA Motors Am., Inc.,* 357 F.3d 392, 400 (3d Cir.2004) ("District court rulings on Pennsylvania law are not authoritative and must yield to rulings of the state Supreme Court or, if none exist, consider decisions of the state's intermediate appellate courts in predicting how the state's highest court would rule.'').

would make it irrelevant when the parties' contractual relationship ended. Yet the entire focus of *Thorpe* was the date on which the parties ended their relationship:

> We ... believe the jury could well have found that the doctor-patient relationship was not terminated until sometime after August 30, 1954, and that the contract had not been terminated more than six years [11] prior to the time the suit was commenced.

195 A.2d at 873. Therefore, Defendants' argument must be rejected as contrary to *Thorpe*.[12]

If Plaintiff could prove that the continuing contract doctrine applied in this case, the statute of limitations on its breach of contract claim would run from the termination of the parties' contractual relationship. However, the application of the continuing contract doctrine to this case requires factual determinations that cannot be made on a motion to dismiss. Thus, I will deny Defendants' motion with respect to Counts I and III of the Amended Complaint, without prejudice to Defen-

dants to reassert the statute of limitations issue after discovery.

## B. *"Equitable Estoppel" Claim*

■ Count VI of the Amended Complaint alleges "equitable estoppel" against all defendants. However, as Defendants point out, there is no independent cause of action for "equitable estoppel" under Pennsylvania law—it may only be asserted as a defense.[13] *Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir.1990); *Gilius v. Bd. of Sup'rs of Fairview Tp.*, 122 Pa.Cmwlth. 371, 552 A.2d 327, 330 (1988). The only sense in which there is a cause of action for "equitable estoppel" is insofar as the phrase is sometimes used interchangeably with *promissory* estoppel, a related but distinct concept.[14] *See, e.g., Kreutzer v. Monterey County Herald Co.*, 560 Pa. 600, 747 A.2d 358, 361 (2000) ("The concept of equitable estoppel originated in the fourteenth century[.] ... [E]quity validated and enforced promises predicated on what we now label 'promissory estoppel' "); *Weiland v. DeFrancisis*, 1996 WL 766421, at *3 (Pa.Com.Pl. Jan. 8, 1996) (construing a

---

**11.** The limitations period then in effect for breach of contract.

**12.** Defendants' interpretation of *Thorpe* is also inconsistent with scholarly authority on when the statute of limitations begins to run on a continuing contract:

> Where ... a contract that is not strictly divisible provides for an entire continuing performance and that performance is continued, in spite of a breach in failing to make partial payments or to render such other part performances as would have justified discontinuance, there seems good reason to allow recovery of damages based on the entire payment or performance promised, at any time within the statutory period computed from the time when the completed performance was due.

31 Williston on Contracts § 79:20, at 361–62 (Richard A. Lord ed., 4th ed.2004).

**13.** "Equitable estoppel" is defined as "a *defensive* doctrine preventing one party from

taking unfair advantage of another when, through false language or conduct, the person to be estopped has induced another person to act in a certain way, with the result that the other person has been injured in some way." Black's Law Dictionary 590 (8th ed.2004) (emphasis added).

**14.** Plaintiff admits as much in its response to Defendants' motion: "[R]egardless of how the equitable estoppel relief is phrased, *i.e.* 'promissory estoppel' or 'equitable estoppel,' the Pennsylvania Courts have refused to allow the terms used to label the cause of action to bar a cause of action." (Pl.'s Resp. Opp. Defs.' Mot. Dismiss at 51.) It is true that "a plaintiff who attempts to recover upon a promise on the basis of estoppel need not attach any particular label to his claim." *Wolcott v. Allstate Ins. Co.*, 33 Pa. D. & C. 4th 341, 345 (Pa.Com.Pl.1996).

claim for "equitable estoppel" as one for promissory estoppel). Thus, Count VI of the Amended Complaint alleges, if anything, a claim for promissory estoppel.

■ To make out a claim of promissory estoppel under Pennsylvania law, a plaintiff must allege three elements: (1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise. *Crouse*, 745 A.2d at 610. The "promise" that forms the basis of Plaintiff's promissory estoppel claim appears to be Defendants' allegedly misleading statements to Plaintiff's assignors that the issuance of certificates and filing and/or updating of registrations would be taken care of promptly. (Am.Compl.¶ 129–30.) Plaintiff alleges that its assignors relied on these representations to their detriment. (*Id.* ¶ 131–33.)

■ However, "[t]he doctrine of promissory estoppel is only employed to enforce a promise where there has been no consideration." *Holewinski v. Children's Hosp.*, 437 Pa.Super. 174, 649 A.2d 712, 715 (1994); *Carlson*, 918 F.2d at 416 (promissory estoppel is "invoked in situations where the formal requirements of contract formation have not been satisfied"). Here, the parties do not dispute that their relationship is governed by enforceable written contracts supported by consideration. Thus, because "promissory estoppel has no application when parties have entered into an enforceable agreement," *Synesiou v. DesignToMarket, Inc.*, 2002 WL 501494, at *4 (E.D.Pa. Apr.3, 2002), Plaintiff cannot

maintain a claim for promissory estoppel. *See Carlson*, 918 F.2d at 416 ("In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted."); *Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.*, 246 F.Supp.2d 394, 408 (E.D.Pa.2002) ("Because Blue Mountain's interests are protected under a contract with full consideration, the consideration substitute of promissory estoppel is unneeded."). Accordingly, I will dismiss Count VI of the Amended Complaint.[15]

## C. Tort Claims

Counts II, IV, V, VII, IX, and X of the Amended Complaint allege conversion by VerticalNet, breach of fiduciary duty by VerticalNet, McKenzie, Walsh, and Alexander, "equitable fraud" by all defendants, negligence by all defendants, negligent misrepresentation by McKenzie, and negligent supervision by VerticalNet, McKenzie, Walsh, and Alexander. Defendants raise numerous grounds for the dismissal of these tort claims, including the statute of limitations, the "gist of the action" doctrine, the "economic loss" doctrine, and various other grounds particular to specific causes of action. Because Plaintiff's tort claims are entirely duplicative of and collateral to its contract claims, they are barred by the gist of the action doctrine. Because I grant Defendants' motion with respect to Plaintiff's tort claims on this basis, I do not address any of Defendants' other arguments for dismissal.

■ Under the gist of the action doctrine, Pennsylvania intermediate courts have held that plaintiffs may not recast ordinary breach of contract claims into tort claims.[16] *Bash v. Bell Tel. Co. of Pennsyl-*

---

**15.** Of course, I may reconsider this decision if any of the parties' agreements are found to be unenforceable.

**16.** Although the Pennsylvania Supreme Court has neither accepted nor rejected the doc-

trine, the Pennsylvania Superior Court and several federal district courts have predicted that it would. *See, e.g., Air Products and Chemicals, Inc. v. Eaton Metal*, 256 F.Supp.2d 329, 340 (E.D.Pa.2003); *Asbury Auto. Group.*

*vania,* 411 Pa.Super. 347, 601 A.2d 825, 829 (1992). "The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment Auth. of Cambria County v. Int'l Ins. Co.,* 454 Pa.Super. 374, 685 A.2d 581, 590 (1996). Therefore, the gist of the action is contractual if "the parties' obligations are defined by the terms of contracts, and not by the larger social policies embodied by the law of torts." *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 104 (3d Cir.2001). In this case, Plaintiff has failed to plead a breach of any duty imposed by social policy as opposed to mutual consensus.

▆ Here, the thrust of Plaintiff's tort claims, like its breach of contract claims, is that Defendants caused four delays during which Plaintiff was unable to sell the Merger Stock and it declined in value. These delays allegedly resulted from Defendants' failure to take various actions in a timely fashion—issuing share certificates, filing and/or updating registration statements, and releasing shares from Lock–Up and escrow. However, if it were not for the various contractual arrangements between the parties regarding the merger and the stock transfer, Defendants would have no obligation whatsoever to perform any of these actions, much less to perform them within a certain time. Plaintiff's tort claims thus all involve breaches of duties imposed only by mutual consensus and not "as a matter of social policy," *Redevelopment Auth.,* 685 A.2d at 590, thus simply replicating Plaintiff's breach of contract claims.

Plaintiff's arguments for why the gist of the action doctrine should not apply are unpersuasive. Plaintiff cites *Bohler–Uddeholm* for the uncontroversial proposition that the mere existence of a contract between two parties does not, in itself, preclude a tort claim by one against the other. 247 F.3d at 104. Here, however, Plaintiff is attempting to bring tort claims based solely on alleged breaches of contract. Plaintiff further argues that gist of the action does not apply because "the Merger Agreement is collateral to the Defendants' primary tortious conduct." (Pl.'s Resp. Opp. Defs.' Mot. Dismiss at 27.) However, Plaintiff supports this argument only with conclusory assertions that there is an independent basis for its tort claims other than the contractual relationship between the parties. Plaintiff also asserts that the gist of the action doctrine is inapplicable because Plaintiff had a "special relationship" with Defendants, but cites no case in which a court refused to apply the doctrine on this basis. Nor does Plaintiff cite any legal authority that would support a finding of such a relationship in this case.

Ultimately, Plaintiff's tort claims fail because Plaintiff does not support its assertion that "the duties breached by the Defendants, *i.e.* a duty to properly process the stock transfers of the Plaintiffs, is imposed as a matter of social policy rather than by mutual consensus." (Pl.'s Resp. Opp. Defs.' Mot. Dismiss at 33.) Plaintiff notes that the securities industry is regulated by various federal and state statutes. Be that as it may, it does not establish that

LCC v. Chrysler Ins. Co., 2002 WL 15925, at *3 n. 3 (E.D.Pa. Jan.7, 2002); eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa.Super.2002); Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 123 F.Supp.2d 826, 833 n. 11 (E.D.Pa.2000); Bash v. Bell Tel. Co. of Pa., 411 Pa.Super. 347, 601 A.2d 825, 829–30 (1992). When a state's highest court has not decided an issue, a district court may look to intermediate state appellate court decisions to facilitate its prediction of how the state supreme court would rule. Paolella v. Browning–Ferris, Inc., 158 F.3d 183, 189 (3d Cir.1998).

any specific duty to the Plaintiff that the Defendants allegedly breached has been imposed by social policy and not mutual consensus. Plaintiff also notes that "society has an interest in seeing that officers and directors of a company do not manipulate the release of stock·into the market so as to manipulate the stock price." (Pl.'s Resp. Defs.' Mot. Dismiss at 34.) However, aside from one vague allegation that Defendants were engaged in such a market manipulation scheme, (Am. Compl.¶¶ 12–13), this theory does not form the basis of any of Plaintiff's tort claims. Plaintiff cannot convert an alleged breach of contract into a tort simply by suggesting that it was part of a larger, tortious scheme that is not the basis of Plaintiff's tort causes of action.

Finally, Plaintiff claims that the gist of the action is a "fact-intensive" question, *Williams v. Hilton Group PLC*, 93 Fed. Appx. 384, 386 (3d Cir.2004), that may not properly be decided on a motion to dismiss. Here, however, Plaintiff has not pleaded any facts tending to show that any of Defendants' acts or omissions constituted a tort, rather than a breach of contract. Absent the various contracts to which the parties mutually assented, Defendants were under no obligation to perform, or not to perform, any of the actions that form the basis of Plaintiff's tort claims. Because Counts II, II, IV, V, VII, IX, and X of the Amended Complaint are thus an attempt to "recast ordinary breach of contract claims into tort claims," *Bash*, 601 A.2d at 829, they must be dismissed under the *gist of the action doctrine.*

### D. *Uniform Commercial Code (UCC) Claims*

Count VIII of the Amended Complaint alleges violations of Sections 8–401 and 8–407 of the Uniform Commercial Code (UCC),[17] 13 Pa. Cons.Stat. Ann. §§ 8401 and 8407, by VerticalNet and ASTT. Section 8–401 provides:

*Duty of issuer to register transfer.*

(a) General rule.—If a certificated security in registered form is presented to an issuer with a request to register transfer or an instruction is presented to an issuer with a request to register transfer of an uncertificated security, the issuer shall register the transfer as requested if:

(1) under the terms of the security the person seeking registration of transfer is eligible to have the security registered in its name;

(2) the indorsement or instruction is made by the appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(3) reasonable assurance is given that the indorsement or instruction is genuine and authorized (section 8402);

(4) any applicable law relating to the collection of taxes has been complied with;

(5) the transfer does not violate any restriction on transfer imposed by the issuer in accordance with section 8204 (relating to effect of issuer's restriction on transfer);

---

**17.** Count VIII of the Amended Complaint refers to Section 8–406 of the UCC, 13 Pa. Cons.Stat. Ann. § 8406, instead of 8–407. Section 8–406 deals with "lost, destroyed or wrongfully taken security certificate[s]," *id.,* and *is clearly irrelevant to this case.* However, it is clear from the Amended Complaint and Plaintiff's motion papers that Plaintiff relies on 8–407, and that any reference to 8– 406 was a typographical error. I am surprised that Plaintiff has not yet corrected this mistake, especially after it was pointed out by Defendants. (Defs.' Mot. Dismiss at 45 n. 31.) Nevertheless, I assume for purposes of this motion that the Amended Complaint includes a claim under 8–407 and I will grant Plaintiff leave to amend the complaint.

(6) a demand that the issuer not register transfer has not become effective under section 8403 (relating to demand that issuer not register transfer) or the issuer has complied with section 8403(b) but no legal process or indemnity bond is obtained as provided in section 8403(d); and

(7) the transfer is in fact rightful or is to a protected purchaser.

(b) Liability for failure or delay in registration.—If an issuer is under a duty to register a transfer of a security, the issuer is liable to a person presenting a certificated security or an instruction for registration or to the person's principal for loss resulting from unreasonable delay in registration or failure or refusal to register the transfer.

13 Pa. Cons.Stat. Ann. § 8401. Section 8–407 provides:

> *Authenticating trustee, transfer agent and registrar.*
>
> A person acting as authenticating trustee, transfer agent, registrar or other agent for an issuer in the registration of a transfer of its securities, in the issue of new security certificates or uncertificated securities or in the cancellation of surrendered security certificates has the same obligation to the holder or owner of a certificated or uncertificated securi-

ty with regard to the particular functions performed as the issuer has in regard to those functions.[18]

13 Pa. Cons.Stat. Ann. § 8407. Defendants argue that Plaintiff's UCC claims should be dismissed under the statute of limitations, as well as under the gist of the action and economic loss doctrines.[19] For the reasons that follow, I will deny Defendants' motion to dismiss with respect to this Count of the Amended Complaint.

## 1. Statute of Limitations

No Pennsylvania statute or case explicitly sets forth the statute of limitations for a claim under Section 8–401 or 8–407 of the UCC. Accordingly, Plaintiff argues that it should be subject to Pennsylvania's six-year "catch-all" statute of limitations, which provides:

> Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years.

42 Pa. Cons.Stat. Ann. § 5527. Defendants, on the other hand, argue that because "plaintiff's [UCC] claim is based upon the negligent (or wrongful) breach of duties imposed by this statute," (Defs.'

---

**18.** Plaintiff appears to invoke Section 8–407 in order to hold Defendant ASTT liable for conduct that allegedly violated Section 8–401. (*See* Am. Compl. ¶ 143.) Section 8–407 does not enumerate specific obligations on the part of an "authenticating trustee, transfer agent, registrar or other agent for an issuer," but instead imposes on them "the same obligation[s]" as issuers of stock have under, *inter alia*, Section 8–401. Thus, Plaintiff's Section 8–407 claim against ASTT would seem to be derivative of its Section 8–401 claim. Because the parties address their arguments solely to whether Plaintiff can maintain a claim under Section 8–401 and do not deal with the two provisions separately, I will do the same.

**19.** In their reply brief, Defendants also make a cursory argument that Count VIII of the Amended Complaint fails to state a claim under Section 8–401 "to the extent it is premised on alleged delays in registration of Jodek's predecessors' share of VerticalNet stock with the SEC." (Defs.' Repl. Supp. Mot. Dismiss at 36.) Defendants also suggest in a footnote that Count VIII might be partially preempted by the Securities Act of 1933. (*Id.* at 36 n. 15.) However, Defendants do not appear to argue that Count VIII is preempted or fails to state a claim insofar as it alleges failure to promptly issue or re-issue share certificates. Because these matters have not been adequately briefed, I decline to address them at this stage of the litigation.

Mot. Dismiss at 46), this claim sounds in tort and should be governed by the two-year statute of limitations applicable to torts.[20]

Defendants claim that Section 8–401 establishes liability for negligent or wrongful violations; however, neither the word "negligent" nor the word "wrongful" appear anywhere in this statutory provision. Defendants argue that because the statute speaks of "unreasonable delay in registration," it necessarily requires an inquiry into the "reasonableness" *vel non* of a party's conduct, which Defendants claim is the hallmark of negligence and thus, of tort. Yet an interpretation of the statute that would import a negligence standard into the statute strains the meaning of "reasonable" in this context. The statute imposes liability for "loss resulting from unreasonable delay in registration or failure or refusal to register the transfer." 13 Pa. Cons.Stat. Ann. § 8401. The word "unreasonable" merely modifies and describes the word "delay"; it does not invite an inquiry into whether it was "reasonable" for a party to have caused the delay. Many Pennsylvania statutes speak of "unreasonable delay" without imposing any liability, tort or otherwise, on the party responsible for it. *See, e.g.,* 13 Pa. Cons. Stat. Ann. § 2712 (under the UCC, "buyer may 'cover' by making in good faith and without *unreasonable delay* any reasonable purchase of or contract to purchase [substitute] goods"); 18 Pa. Stat. Ann. § 11.901 (victim of crime eligible for certain government services "only if the victim reported the crime to law enforcement authorities without *unreasonable delay*") (emphasis added).

Moreover, 8–401 imposes liability not only for "unreasonable delay" in registering shares, but for "failure or refusal" to register, without regard for whether this failure or refusal is reasonable. Accordingly, Count VIII of the Amended Complaint alleges that Defendants violated the statute by, *inter alia,* "simply failing to so register the Merger Stock after the Plaintiff's assignor's requests." (Am. Compl.¶ 142.) Thus, I reject Defendants' argument that a claim under Section 8–401 sounds in tort.

Indeed, Section 8–401 presents none of the characteristics on which courts have relied in applying Pennsylvania's two-year statute of limitations to a cause of action. For instance, in *Ash v. Continental Ins. Co.,* 861 A.2d 979 (Pa.Super.2004), the Pennsylvania Superior Court held that a claim for bad faith failure to pay on an insurance policy, 42 Pa. Cons.Stat. Ann. § 8371, sounded in tort and was thus governed by a two-year statute of limitations.[21] In doing so, however, the court noted that a bad faith claim requires "an inquiry into the reasonableness of the insurer's behavior, to see whether it is perhaps more than mere negligence or bad judgment," which the court found to bear "the classic earmarks of the law of torts." *Id.* at 983 (quoting *Nelson v. State Farm Mut. Auto. Ins. Co.,* 988 F.Supp. 527, 532–33 (E.D.Pa.1997)). As discussed above, a claim under Section 8–401 requires no such inquiry. The court in *Ash* also noted

---

20. In addition to providing for a two-year statute of limitations for various enumerated torts, 42 Pa. Cons.Stat. Ann. § 5524 also sets a two-year limitations period for "[a]ny other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter." 42 Pa. Cons.Stat. Ann. § 5524(7).

21. This decision was one of several that effectively overruled my own decision in *Woody v. State Farm Fire and Cas. Co.,* 965 F.Supp. 691 (E.D.Pa.1997), which applied a six-year statute of limitations to this cause of action.

that the bad faith statute authorized punitive damages, which are "typically a remedy only in tort actions." *Id.* (quoting *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 235 (3d Cir.2003)). My research has revealed no authority for awarding punitive damages for a violation of Section 8–401. Finally, the *Ash* court found that the history of the bad faith cause of action, its treatment by Pennsylvania trial courts and the courts of other states, and the circumstances of its codification by the Pennsylvania legislature all pointed to a two-year tort statute of limitations. *Id.* at 983–84. That is simply not the case for Section 8–401.

Because Section 8–401 is a *sui generis* statutory creation that is not directly analogous to tort or to any other cause of action with a specified limitations period, it is governed by Pennsylvania's six-year catch-all statute of limitations. In *Gabriel v. O'Hara*, 368 Pa.Super. 383, 534 A.2d 488 (1987), the Pennsylvania Superior Court held that a claim under the Unfair Trade Practices and Consumer Protection Law (UTPCPL), for which the legislature did not specify a limitations period, fell under the six-year statute of limitations. *Id.* at 495–96. Crucially, the court in *Gabriel* looked to whether every claim that could potentially be brought under the UTPCPL could be characterized as sounding in tort, contract, defamation, or some other type of action with a specified statute of limitations. *Id.* at 494–95. Because the "*sui generis* nature*" of the UTPCPL prevented

such categorization, *id.* at 494, the court found that "the UTPCPL creates a civil action which is separate and distinct from appellants' other causes of action and for which the legislature provided no limitations period." *Id.* at 495. In such instances, the court found, the six-year catch-all statute of limitations must apply.[22] *Id.*

While a claim under Section 8–401 can certainly be brought for intentional or negligent failure to register a stock transfer, the statute does not require that the failure be either intentional or negligent. Thus, not every claim that could potentially be brought under Section 8–401 sounds in tort. *See Gabriel*, 534 A.2d at 495–96; *see also Mistick PBT v. Liss*, 57 Pa. D. & C. 4th 233, 235 (Pa.Com.Pl.2002). Therefore, I predict that the Pennsylvania Supreme Court would hold that a claim under Section 8–401 or 8–407 of the UCC is subject to the six-year catch-all statute of limitations. Because Plaintiff filed suit within six years of the alleged violations, I find Plaintiff's UCC claims timely.

### 2. Gist of the Action

■ My decision that a claim under Section 8–401 of the UCC does not sound in tort also disposes of Defendants' gist of the action argument. The purpose of this doctrine is to "maintain the conceptual distinction between breach of contract claims and tort claims." *eToll*, 811 A.2d at 14. Because Section 8–401 creates neither a tort nor a contract cause of action, it does not implicate this concern. Nor has either

**22.** In addition to *Gabriel*, many other Pennsylvania cases have applied the six-year catch-all statute of limitations to causes of action that, like Section 8–401, involve a duty imposed by statute. *See Pantuso Motors, Inc. v. Corestates Bank, N.A.*, 568 Pa. 601, 798 A.2d 1277, 1284 (2002) (statutory action against judgment creditor for failure to enter satisfaction); *Pa. Nat'l Mut. Cas. Ins. Co. v. Nicholson Constr. Co.*, 374 Pa.Super. 13, 542 A.2d 123, 126 (1988) (statutory action for contribu-

tion); *DePaolo v. Dep't of Pub. Welfare*, 865 A.2d 299, 305–06 (Pa.Cmwlth.2005) (action under worker's compensation statute for employees of state mental hospitals); *Mistick PBT v. Liss*, 57 Pa. D. & C. 4th 233, 243 (Pa.Com.Pl.2002) (action under Pennsylvania Storage Tank and Spill Prevention Act); *Cataldo v. Rick*, 10 Pa. D. & C.3d 348, 353 (Pa.Com.Pl.1979) (action for reimbursement against uninsured motorist under No-fault Motor Vehicle Insurance Act).

party cited any case in which the gist of the action doctrine was applied to bar a *sui generis* statutory cause of action as duplicative of a contract claim. I therefore reject Defendants' gist of the action argument.

### 3. Economic Loss

 Finally, I must address Defendants' argument that Count VIII must be dismissed under the "economic loss" doctrine—a question I did not reach with respect to Plaintiff's other tort claims. A cousin of the gist of the action doctrine, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir.2002). Because Plaintiff's UCC claim does not sound in tort, the economic loss doctrine is inapplicable.

For the reasons stated above, I will deny Defendants' motion to dismiss with respect to Count VIII of the Amended Complaint.

### E. *Ad Damnum Clause*

 Defendants also move to strike the Ad Damnum clause of the Amended Complaint for failure to comply with Local Rule of Civil Procedure 5.1.1, which provides:

No pleading asserting a claim for unliquidated damages shall contain any allegation as to the specific dollar amount claimed, but such pleadings shall contain allegations sufficient to establish the jurisdiction of the court, to reveal whether the case is or is not subject to arbitration under Local Rule 53.2, and to specify the nature of the damages claimed e.g., 'compensatory,' 'punitive,' or both.

Local R. Civ. P. 5.1.1. "Applying this Rule, courts in this District have consistently rejected attempts by plaintiffs to plead specific dollar amounts for unliqui-

dated damages." *Rothotherm Corp. v. Penn Linen & Uniform Serv., Inc.*, 1997 WL 419627, at *18 (E.D.Pa. Jul.3, 1997) (quoting *Doe v. Provident Life and Acc. Ins. Co.*, 936 F.Supp. 302, 309 (E.D.Pa. 1996)). To the extent that Plaintiff's Ad Damnum clause requests "compensatory damages in an amount in excess of Sixty Million dollars ($60.0 MM) (USD)," it violates Local Rule 5.1.1 and must be stricken. Plaintiff contends that it alleged $60 million in damages merely to indicate that this matter was not subject to compulsory arbitration under Local Rule 53.2. However, under this rationale, every allegation of a specific dollar amount in damages greater than $150,000 would have to be allowed, despite the fact that Rule 5.1.1 explicitly forbids such pleading. To avoid compulsory arbitration, Plaintiff could simply have pleaded that the amount in controversy exceeded $150,000. Accordingly, I will grant Defendants' motion to strike the reference in the Ad Damnum clause to a specific dollar amount in damages.

## VI. CONCLUSION

For the foregoing reasons, I will grant Defendants' motion to dismiss with respect to Plaintiff's tort claims and its claim for promissory or "equitable" estoppel. I will deny Defendants' motion with respect to Plaintiff's claim of UCC violations. With respect to Plaintiff's breach of contract claims, I will deny Defendants' motion without prejudice to raise all the issues raised in the motion at the time of summary judgment. Because I am dismissing all of the Plaintiff's counts against the individual defendants McKenzie, Walsh, and Alexander, I will dismiss these defendants with prejudice. Finally, I will strike the references to a specific dollar amount in damages in the Ad Damnum clause of Plaintiff's Amended Complaint.

## ORDER

**AND NOW**, this *26th* day of January, 2006, upon careful consideration of the Motion of Defendants to Dismiss the Amended Complaint (Doc. # 13), Plaintiff's Response (Doc. # 16), Defendant's Reply (Doc. # 18), and Plaintiff's Supplemental Memorandum of Law (Doc. # 26), it is **ORDERED** that:

(1) with respect to Counts I and III of the Amended Complaint (Plaintiff's breach of contract claims), Defendants' motion to dismiss on statute of limitations grounds is **DENIED** without prejudice to Defendants to raise the statute of limitations at a later stage of the litigation, after discovery;

(2) with respect to Counts II, IV, V, VII, IX, and X of the Amended Complaint (Plaintiff's tort claims), Defendants' motion to dismiss is **GRANTED**;

(3) with respect to Count VI of the Amended Complaint (Plaintiff's "equitable estoppel" claim), Defendant's motion to dismiss is **GRANTED**;

(4) with respect to Count VIII of the Amended Complaint (Plaintiff's UCC claim), Defendants' motion to dismiss is **DENIED**;

(5) Defendants James McKenzie, Esq., Mark L. Walsh, and Douglas A. Alexander are **DISMISSED**; and

(6) the Ad Damnum clause of Plaintiff's Amended Complaint (Doc. # 3) is **STRICKEN** and shall be amended to conform to Local Rule of Civil Procedure 5.1.1.